## William V. Munnis, Appellee, v. The Northern Hotel Company and General Accident, Fire & Life Assurance Company, Ltd., Appellants.

### Gen. No. 29,371.

1. Rescission and cancellation—*mistake as grounds for rescission.* An instrument may be rescinded in a court of equity by a party who, without negligence, entered into a contract through an existing mistake of fact, provided the rescinding of the contract may be made without injustice to the other party.

2. Releases—*setting aside release of damages for injuries for mistake.* A release of damages for personal injuries should be set aside on the ground of mistake of fact where the release was procured shortly after the injury while plaintiff was in the hospital and suffering severe pain and, from the statements made to him by the insurance adjuster who procured the release and by the attending surgeon, plaintiff was justified in believing that his injuries were not serious or permanent, whereas he was very seriously and permanently injured.

3. Releases—*sufficiency of showing to set aside release of damage liability.* Where a release was procured by an insurance adjuster from an injured person when he was in the hospital and suffering great pain and in such condition that the attending physician should not have permitted the claim agent to see him, plaintiff testifying that at the time he was in no condition to make a settlement and had repeatedly told the agent to leave him alone but had finally signed papers without reading them to get rid of the agent, which testimony was partly corroborated by the nurse who was sent from the room during part of the negotiations, and even on the testimony of the claim agent and the physician who was acting for defendant it was apparent that plaintiff was in no condition to transact business at that time, the settlement should be set aside as unfair and inequitable.

Appeal by defendants from the Superior Court of Cook county; the Hon. Charles M. Foell, Judge, presiding. Heard in the first division of this court for the first district at the March term, 1924. Affirmed. Opinion filed May 11, 1925. *Certiorari* denied by Supreme Court (making opinion final).

John A. Bloomingston, for appellants.

Leesman & Roemer, for appellee.

MR. JUSTICE JOHNSTON delivered the opinion of the court.

This is a suit in equity brought by the complainant, William V. Munnis, against the defendants, The Northern Hotel Company and the General Accident, Fire & Life Assurance Company, Ltd., to cancel and set aside an agreement executed by the complainant, releasing the defendants from any claim for damages for personal injuries received by the complainant in an accident in an elevator operated by the defendant The Northern Hotel Company.

The complainant asks for relief on two grounds: First, that the release was executed by the complainant through a mistake of fact as to the nature and extent of the complainant's injuries; and second, that the defendants obtained the release by taking an inequitable and unconscionable advantage of the complainant at a time when, by reason of pain and weakness, the complainant was not in a position to deal on equal terms with the defendants.

The cause was heard before the chancellor without a reference to a master, and the chancellor entered a decree in favor of the complainant. From the decree the defendants prosecuted this appeal.

No evidence was offered by the defendants on the question of negligence. All of the evidence in the case relates to the question of the validity of the release.

Neither counsel for the defendants nor counsel for the complainant has cited any authorities in Illinois in which a suit in equity was brought to cancel and set aside a release of a claim for damages for personal injuries on the ground of a mistake of fact. Counsel for the complainant say that "there are no Illinois cases directly upon the point." There are, however, decisions in other jurisdictions; and the general rule in equity relating to the cancellation of in-

struments on the ground of a mistake of fact is, of course, recognized in Illinois. An instrument may be rescinded in a court of equity in Illinois by a party who, without negligence, entered into a contract through an existing material mistake of fact, provided the rescinding of the contract may be made without injustice to the other party. *Nelson v. Pedersen,* 305 Ill. 606, 610; *Bivins v. Kerr,* 268 Ill. 164, 167; *Morgan v. Owens,* 228 Ill. 598, 603. A mistake of fact has been defined in the case of *Purvines v. Harrison,* 151 Ill. 219 (p. 224), "to be a mistake, not caused by the neglect of a legal duty on the part of the person making the mistake, and consisting in an unconscious ignorance or forgetfulness of a fact, past or present, material to the contract, or belief in the present existence of a thing material to the contract which does not exist, or in the past existence of a thing which has not existed."

It has been held that to justify the reformation of a contract, and we think the rule will apply as well to a rescission of a contract, the mistake should be proved by clear and convincing evidence. *Purvines v. Harrison, supra* (p. 223).

We are of the opinion that the evidence in the case at bar clearly and convincingly shows that the complainant is entitled to have the release rescinded on the ground of an existing material mistake of fact as to the nature and extent of the actual injuries of the complainant; and that the complainant is entitled to that relief independently of the question whether the release was obtained by inequitable and unconscionable methods, and even though it should be assumed that he was in a normal state of mind and fully capable of dealing on equal terms with the defendants. The release was procured from the complainant while he was in a hospital by an insurance adjuster named John P. Benson, who represented the defendant the General Accident, Fire & Life Assur-

ance Company, Ltd. The consideration for the release was $300, which was grossly inadequate in view of the complainant's injuries.

At the time that the complainant executed the release the only information that he had in regard to the character of his injuries was derived from Benson, the insurance adjuster, and Dr. John W. Cousins, the attending physician. Benson got his information as to the injuries of the complainant from Dr. Cousins. The insurance adjuster testified that Dr. Cousins told him in the presence of the complainant that there was some laceration in the groin of the complainant, but that he could not find any broken bones and that the complainant was getting along nicely under the conditions. According to Dr. Cousins the complainant had a laceration of the interior surface of the right leg, shin, foot and knee; had severe contusions and lacerations on the exterior surface of the left thigh, skin lacerations and contusions, lacerations of the left anterior surface of the left hip two inches in length and down through the muscular structures; had severe skin lacerations and contusions over the left side of the abdomen; had severe contusion and laceration of the palmar surface of the four fingers. On the back of complainant Dr. Cousins found a hematoma from which he removed about a gallon of exudate and bloodserum.

The diagnosis of Dr. Cousins was incomplete in material respects. The fact is that the complainant was seriously and permanently injured. He had a laceration or tear beginning about an inch in front of the anus, and extending along the perineum almost to the scrotum; there it branched to the left side up into the groin and extended clear up into the groin forward and backward until the upper point of it was about even with the top of the pubic bone. He had a laceration or tear about the junction of the end of the penis next to the body, about half way or

maybe more around. He had a dislocation of the hip in what is called the sacroiliac synchondrosis. The sliding displacement of the ilium upward was about one inch, causing a corresponding displacement at the pubic junction. He had a fracture in the adjacent ramus, or branch or arm of the pubic bone, and a fracture of the body of the ischium, which is that portion of the ilium with which the articulation of the head of the femur takes place. The ligaments supporting the sacroiliac joint were torn. In the transverse process of the fourth lumbar vertabra a bony union has occurred between itself and a fragment that it seems has been broken off the ilium. His left leg is shorter than the other, and he cannot walk without crutches.

Benson, the insurance adjuster, told the complainant that the complainant was not hurt very badly; that the accident was not very bad; that he would be up in a few days; that Dr. Cousins said that the complainant just had some bruises and would be out in a week or ten days. Dr. Cousins testified that in the presence of the complainant and Benson he made the following statement to the insurance adjuster:

"Mr. Benson, I have no idea how long this man will be here. I don't know what my fee will be. * * * I want you to know that before you say you are going to pay all the expenses so you may have some idea as to the probable expenses"; that he then turned to the complainant and said:

"Young man, when you get out of this hospital I will tell you how long you were here. I am not in a position to tell you how long you are going to be here, or the extent of your injuries, or the permanent ability of your injuries; and if there is any settlement made here, you do it of your own volition; I am not a party to it."

These enigmatical statements of Dr. Cousins in regard to the complainant's injuries, even if accepted as true, do not purport to tell the complainant the

nature and extent of his injuries; nor do they contradict the statement made to the complainant by Benson, the insurance adjuster, as to what Benson told the complainant Dr. Cousins had said to him, Benson, in regard to the complainant's injuries. In the circumstances the complainant was reasonably justified in believing that his injuries were not serious and permanent. Furthermore, assuming that Benson and Dr. Cousins were acting in good faith, and were not trying to deceive the complainant in regard to his injuries, then Dr. Cousins and Benson were innocently mistaken as to the nature and extent of the complainant's injuries, and the mistake of fact was a mutual mistake between all of the parties. But whether it was mutual or unilateral, the complainant is entitled to have the release rescinded because of the material mistake of fact. 21 Corpus Juris, pp. 87, 88. The evidence does not show that any injustice will be done to the defendants by the rescission of the release.

The conclusions we have expressed are amply supported by adjudicated cases in which the facts are similar to the facts in the case at bar. *McIsaac v. McMurray,* 77 N. H. 466, 473, 474, 475; *Tatman v. Philadelphia, B. & W. R. Co.,* 10 Del. Ch. 105, 85 Atl. 716, 721; *Great Northern Ry. Co. v. Fowler,* 136 Fed. 118, 120, 121.

We are further of the opinion that as an independent ground of equitable relief the complainant is entitled to have the release rescinded for the reason that the evidence shows clearly and convincingly that the release was procured by the defendants by inequitable and unconscionable methods while the complainant was in such pain, suffering and weakness as to be incapable of dealing on equal terms with the defendants.

Since the complainant was mentally capable of knowing and understanding what he was doing, ac-

cording to the rule in Illinois the release could not be impeached in an action at law, but the power of a court of equity would have to be invoked to impeach the release before an action at law could be prosecuted. *Turner v. Manufacturer's & Consumer's Coal Co.,* 254 Ill. 187, 193.

Notwithstanding that the release was executed by the complainant while he was mentally capable of knowing and understanding what he was doing, we think that the release was executed in such circumstances that it was invalid and should be rescinded in a court of equity.

It is the general rule that where the parties are not on equal terms, equity will afford relief from an oppressive and unconscionable bargain. *Dillman v. Nadelhoffer,* 119 Ill. 567, 575; *Brown v. Gaffney,* 28 Ill. 149, 158; *Smith v. Hopping,* 158 Ill. App. 439, 443; *Brueggestradt v. Ludwig,* 82 Ill. App. 435, 450.

The complainant was injured in an elevator of the defendant The Northern Hotel Company, after he had registered as a guest at the hotel, had been assigned a room, and had taken the elevator to go to his room. A bell boy was accompanying him to show him his room. When they reached their floor the elevator stopped, the bell boy got out and the complainant started to follow him. As the complainant was stepping out of the elevator the operator of the elevator started it downwards, the complainant was thrown backwards, and was caught in between the opening or door of the elevator and the elevator shaft, with his head and shoulders hanging down. The elevator descended about a floor and a half before it was stopped. When the elevator was stopped the complainant fell to the floor of the elevator. Dr. Cousins, who resided at the hotel, took the complainant to a hospital in an ambulance, examined him and dressed his wounds. Dr. Cousins testified that at this time the complainant was in more or less shock

Munnis v. The Northern Hotel Co. et al., 237 Ill. App. 50.

but was not unconscious; that "he seemed to be in great pain and considerable shock."

The complainant testified that when he fell he was rendered unconscious; that when he regained consciousness he was lying on a couch in the lobby of the hotel; that he could not see well; that he tried to speak out but could not; that some one put a glass to his lips and said "drink this"; that the drink seemed to revive him; that he remembers being put on a stretcher and taken to an ambulance; that after that he did not know what happened until he "came to" on the bed at the hospital; that he was taken to the operating room; that he was in "awful pain"; that he was suffering, shaking and sweating; that some one injected something in his right arm and put iodine on his wounds; that it hurt him "terribly"; that they started to "sew him up"; that he was taken from the operating room, put to bed, and that he went to sleep; that that night his sleep was very fitful and nervous; that he was in great pain and very weak; that "it hurt" him "all over"; that he remembers waking up and that he was awful hot; that he was sweating and shaky; that he would go to sleep and would wake up; that he had a spell of vomiting that made him very weak; that sometime towards morning he went to sleep again; that his hip hurt him in the morning; that "it seemed to hurt" him in the back; that the bed seemed awfully hard; that "they put lots of pillows" under him.

The release was executed on the morning after the accident at about ten or eleven thirty o'clock. The complainant testified that he was sleeping after an awful night when some one came in and poked him; that he partly came to and told "them" please to go away and leave him alone, that he was feeling awfully bad; that he really couldn't think very well; that he thought the man would go away and leave him alone and so he tried to sleep again; that he was

poked again, looked around, and saw Dr. Cousins and some big man besides Dr. Cousins; that Dr. Cousins said this was a claim agent and that "they" had come over to see that he was being treated right, to see how he was getting along; that he begged them to leave him alone and told them that he was not able to think much what he was doing; that the pain was so very great after that night, that he vomited during the night and felt very weak; that he subsequently learned that the claim agent's name was Benson; that Dr. Cousins and Benson were the only two men in the room; that the nurse was in the room; that Dr. Cousins asked the nurse to leave the room; that Benson started to talk about settlement; that he, the complainant, told him that he, the complainant, was not in any condition to talk settlement; that he could not concentrate his thoughts at all; that it seemed like the more Benson talked to him the worse the pain became; that he tried to lay his head over and go to sleep; that he asked Benson to leave but Benson kept on talking, said something about his being over there today to make this settlement; that Benson said that if he, the complainant, did not settle, he, the complainant, would not get anything out of it; that Benson said that he, the complainant, was not hurt badly; that Benson said that Dr. Cousins said that he, the complainant, just had some bruises and would be out in a week or ten days; that Benson said that if he, the complainant, did not make the settlement then, he Benson, would leave him, the complainant, flat, as he, Benson, would not come out again; that he, the complainant, said he "didn't care," that he wasn't able to read at that time and didn't want to talk to him," Benson, and "didn't want to be bothered"; that as well as he can remember Benson stayed about an hour; that Dr. Cousins "didn't stay there all of the time"; that he went out of the room; that the nurse came in again; that Benson asked her

to leave and she left; that Dr. Cousins came back shortly after the nurse left; that Dr. Cousins and Benson had some kind of a conversation; that he, the complainant, heard Dr. Cousins ask Benson what he, Benson, was going to pay him, the complainant; that Benson said that he thought the company would pay him $200; that Dr. Cousins told Benson that complainant's clothes were torn and damaged, and that Benson should give him $300; that Benson brought some papers over to him, the complainant, and laid the papers on his chest; that he was lying flat on his back without any pillows under his head; that he begged Benson to go away and leave him alone; that Benson's tone seemed to get sharper, and that Benson again told him that if he "didn't settle" then, he, Benson, would leave him, the complainant, flat, and that he, the complainant, "wouldn't get a thing out of it"; that Benson said that his, the complainant's, doctor said that he, the complainant, "wasn't injured very bad"; that Benson said that he, the complainant, would have to pay all his doctor's bills and this would be the only settlement and such things as that; that finally he signed a couple of papers to get rid of Benson; that he didn't read the papers and that Benson didn't read them to him; that he, the complainant, wasn't able to read; that his thoughts were not concentrated; that Benson put a book on his, the complainant's, chest, said "sign here," and that he, the complainant, signed several papers; that at the time his head was aching very badly, his back was hurting him terribly, and he was in a very weak condition.

A draft for $300 was left in the room of the complainant by Benson. The father of complainant arrived at the hospital the day after Benson left the draft in complainant's room. The draft was returned uncashed to the defendant, the General Accident, Fire & Life Assurance Company, within a day or two after it was left in complainant's room by Benson.

Shortly after the draft was sent back Benson and an adjuster named August W. Domke called on complainant at the hospital to return the draft to the complainant. The complainant testified that he was awakened from sleep and saw Benson and another man in his room; that Benson came to his, complainant's, bed and said, "I want you to meet this man from the legal department of the insurance company"; that the man told him, complainant, that the settlement they made with him was legal and fair; that the man tried to get him, the complainant, to take the draft; that he, the complainant, did not take the draft; that Benson said, "Throw it on the table," and that it was thrown on the table and left there.

The following day the draft was again returned to the defendant the General Accident, Fire & Life Assurance Company, and was kept by that company.

The complainant stayed in the hospital twelve days and then was taken to his home in Pontiac, Illinois.

Emma Funk, the nurse who attended the complainant, testified that she was called the day of the accident to attend the complainant, and that she reached the hospital between 1:30 and 2:30 o'clock in the afternoon; that the complainant appeared to be in a shock; that he was very pale; that he was perspiring—a cold sweat all over his body; that he was very nervous and seemed to be under the influence of drugs; that he was throwing himself from one side of the bed to the other with his arms and his head; that he appeared to be in great pain; that his condition that night did not improve very much until along early in the morning; that he was restless at times; that he had a vomiting spell during the night; that his pulse at times was weak, feeble and irregular; that his respiration was gasping like he was gasping for fresh air; that there was a cold perspiration over his entire body; that early in the morning she noticed a large sack across his hips; that it looked like a hema-

Munnis v. The Northern Hotel Co. et al., 237 Ill. App. 50.

toma, a blood tumor; that the complainant appeared to be very weak.

In regard to the circumstances relating to the execution of the release by the complainant, the nurse, Emma Funk, testified that Dr. Cousins and a claim agent came to the room of complainant about 10:30 in the morning; that she was introduced to Benson by Dr. Cousins; that Dr. Cousins asked her to leave the room; that she left the room and stayed out about thirty minutes; that Dr. Cousins was in the room when she returned; that Dr. Cousins came out of the room and talked to her about the condition of the patient; that she does not know whether he went back or not; that when she went back to the room Benson was there; that Benson asked her to leave the room and said that he was not through; that she left; that she went back into the room again before Benson left; that Benson showed her a couple of papers and told her that she would have to sign those in order to draw her fees for nursing the complainant; that she signed them; that she did not read them over; that when Dr. Cousins and Benson come into the room the complainant was perspiring—a cold sweat over his body; that his temperature had come up just a little, but he was very restless and nervous; that she called Dr. Cousins' attention to this sack of blood; that three or four hours after Benson left the complainant told her that he should have waited until his father came; that he, the complainant, was in no condition to make the settlement, but that "they" would not take no for an answer; that complainant didn't tell her that he ought to have more money; that he said he should not have made the settlement; that he did it to get rid of "them"; that his "condition was not such that he could talk to them."

Lillian Jannotte, a nurse at the hospital, who saw complainant when he was brought to the hospital, testified that his temperature was subnormal, some-

where between 94 and 95; that it was so low that she was afraid to register below 95; that the complainant was in great pain and in a weakened condition; that the next morning he was apparently suffering pain.

In addition to the testimony of Dr. Cousins which we have previously stated, Dr. Cousins testified that when he went to the hospital the morning after the accident he saw Benson, took him to the complainant's room and introduced the complainant to Benson; that Benson told the complainant that he represented the insurance company and came there for no other purpose than to assure him that the company was going to pay his expenses and see that he got the proper attention; that Benson and the complainant proceeded to discuss the expense and the amount of money that would probably be involved in the settlement; that he talked to Benson before taking him to the complainant's room, but he did not remember whether Benson asked him about the injuries of the complainant; that he, Dr. Cousins, reminded Benson that the complainant's clothing was badly torn when he was injured; that he, Dr. Cousins, did not tell the nurse, Emma Funk, that he wanted her to go out of the room; that he does not remember of saying to the complainant that he, complainant, "had certain injuries and that is all he had, or anything to that effect."

Dr. Cousins further testified that he resided at the hotel of the defendant, The Northern Hotel Company; that he pays room rent and board the same as any other guest; that the hotel company does not pay him anything and that he has no contract with the company; that the only arrangement that he has with the company is that he "is to be given preference in any case of necessity."

Benson testified that when he got to the hospital the morning after the accident he interviewed Dr. Cousins; that he, Dr. Cousins, told him that he "was

Munnis v. The Northern Hotel Co. et al., 237 Ill. App. 50.

on the case''; that he, Benson, went into the room of the complainant with Dr. Cousins and was introduced to the complainant by Dr. Cousins; that Dr. Cousins told him, Benson, that the complainant was the man who got injured at the hotel; that in the presence of the complainant Dr. Cousins told him, Benson, that there was some laceration in the groin of the complainant, but that he could not find any broken bones, and that the complainant was getting along nicely under the conditions; that he, Benson, then talked to the complainant about a settlement; that he, Benson, asked the complainant whether he wanted to make a settlement at that time or wait until a later time; that the complainant wanted to know who was going to take care of the bill of Dr. Cousins and the bill of the hospital; that he told the complainant that if he settled that the insurance company would pay those bills, and then allow him something for his own trouble; that about this time Dr. Cousins left the room; that the nurse, Emma Funk, was in the room part of the time and out part of the time; that he, Benson, asked her at one time if she would step out of the room; that he was then about to make the settlement with the complainant, and did not think that the complainant wanted to have the nurse know more about his business than she had to; that Dr. Cousins did not at any time in his, Benson's, presence ask the nurse to leave the room; that he, Benson, told Dr. Cousins he had offered the complainant $200, and that Dr. Cousins suggested that he should allow something for the torn clothing of the complainant; that he, Benson finally made a proposition of settlement for $300 and the complainant accepted it; that the complainant signed the release and also signed the draft; that the complainant seemed to be well pleased with the settlement; that the complainant did not tell him, Benson, to get away or to go away, or that he didn't want to talk to him, and did not say any-

thing to that effect; that he was there with the complainant about an hour; that the complainant did not appear to be doped, unconscious, irrational or sleepy during any part of the time; that he, Benson, asked the nurse, Emma Funk, to sign as a witness to the signature of the complainant; that he did not tell her that unless she signed the papers she could not get paid for her services.

Benson further testified that the complainant talked at length about various matters, such as the purpose of his visit to Chicago and the way in which the accident happened.

Evidence was introduced on behalf of the defendants to show that the complainant was conscious at the time he signed the release, and that his mental faculties did not seem to be impaired in any way; that he talked intelligently.

We do not think it is necessary to enter into a lengthy discussion of the evidence in order to show that the complainant dealt with the insurance adjuster on unequal terms, and that the release was obtained by the insurance adjuster in inequitable and unconscionable circumstances. We think that from a mere reading of the evidence these conclusions are irresistible. As was said by the court in the case of *Atchison, T. & S. F. Ry. Co. v. Cunningham,* 59 Kan. 722, in which a release for damages for personal injuries was under consideration (p. 727):

"Where such unseemly haste is made in obtaining settlements with parties who have sustained such serious injuries and where the amount paid is so trifling and utterly disproportionate to any just compensation, it seems like wasting time to nicely discuss questions of evidence bearing on the plaintiff's capacity to transact business."

Granting for the sake of argument that the version of the settlement testified to by Dr. Cousins and Benson is correct, conceding also that the mental faculties of the complainant were not impaired and that

he was conscious of what he was doing, yet the undisputed facts show that he was in no condition properly to transact business, and that the release was executed by him at such a time, in such circumstances and on such terms as condemn the settlement as unfair and inequitable. We think that instead of taking Benson, the insurance adjuster, to the complainant's room, introducing Benson to the complainant and permitting him to enter into negotiations with the complainant, Dr. Cousins should not have allowed Benson to see the complainant.

The decree of the chancellor is affirmed.

*Affirmed.*

McSURELY, P. J., and MATCHETT, J., concur.