Genevieve Ruggles, Conservatrix of the Estate of Charles E. Ruggles, an Incompetent Person, and Genevieve Ruggles, Plaintiffs-Appellees, Cross-Appellants, v. Raymond Selby and Fred Meneely, Defendants-Appellants, Cross-Appellees.

Gen. No. 47,733.

First District, Third Division.

February 17, 1960.

Rehearing denied March 11, 1960.

Released for publication April 14, 1960.

Van Duzer, Gershon, and Jordan, of Chicago (Louis Gershon and Horace W. Jordan, of counsel) for defendants-appellants, cross-appellees.

Louis G. Davidson, of Chicago (Perry M. Berke, of counsel) for plaintiffs-appellees, cross-appellants.

JUSTICE FRIEND delivered the opinion of the court.

Plaintiffs sued to recover damages alleged to have resulted from the negligence of the defendants Raymond Selby and Fred Meneely in the operation of their tractor-trailer truck. Defendants denied liability

and, as a special defense, alleged that plaintiffs had executed a general release for the sum of $900 in favor of defendants. The trial court, acting as a chancellor, set aside the release, and the jury returned verdicts for the plaintiff Genevieve Ruggles as conservatrix of the estate of Charles E. Ruggles, an incompetent person, in the amount of $38,000, and for Genevieve Ruggles individually in the amount of $5000, upon which the trial court entered judgments. Defendants appeal from the decree setting aside the release and also from the judgments in favor of the plaintiffs.

The accident occurred about 11:00 a. m. on September 16, 1954, in Cook County, Illinois. The weather was clear, the pavement dry. Ruggles, then aged seventy, and his wife, sixty-five, were making a trip in a Kaiser four-door hard-top model. Ruggles, with his wife seated beside him, was driving south on Highway 83 toward the intersection of Highway 30. There was a large stop sign facing north toward southbound traffic. Ruggles was unable to testify on trial because of a brain injury which rendered him mentally incompetent. Mrs. Ruggles stated that her husband stopped his car a little past the stop sign, but still north of the intersection; that he turned and looked toward the west, as did she. What he then saw is not known, but she observed the truck that was later involved in the accident; it was approximately 600 feet, or about a full city block, away. After stopping, the Ruggles car started slowly ahead into the intersection. The curve of Highway 30 was such that, by continuing ahead on Highway 83, the Ruggles' car would enter the outer or west side of the southbound lane. When their car got into that lane, Ruggles was going to pull off the west edge of the pavement into a large driveway or parking area in front of a store on the southwest corner to purchase cigarettes. His car continued on, accelerating to not more than twelve to fifteen miles per hour; it was then partly in the inner and

4

outer eastbound lanes of Highway 30 and occupied about one-half of the outer or most westerly southbound lane, and was proceeding straight ahead. There was no room for a truck to pass it on the right or outer lane and still stay on the pavement. As defendants' truck, moving about thirty-five to forty miles per hour, was coming around the curve and approaching the Ruggles' car from the side and from the rear, Mrs. Ruggles heard the loud roar of a motor coming from the rear of their car and to the right; she turned to look back just as there was a terrific crash. The Ruggles' car was struck along the right side, about the middle of the car, and opposite where Mrs. Ruggles was seated. The front left bumper of the truck hit the automobile. No horn was sounded by the approaching truck before it drove into the right side of the Ruggles' car, nor was there any sound indicating application of its brakes or any slackening of speed. Defendants' truck proceeded 400 to 600 feet south of the point of impact before it was brought to a stop at the point where it was parked when the police arrived. The question of negligence turned, in large measure, on whether the Ruggles' car stopped before entering the intersection; if it did stop, as several witnesses testified, the Ruggles' car traveled about 150 feet from Highway 83 to the point where defendants' truck hit it. Only the defendant Selby testified that the Ruggles' car did not stop, but he was contradicted by three other witnesses. Police Officer Dean Lisinski, who talked to Selby at the scene of the accident, asked him how the accident occurred, and at that time Selby made no claim that the Ruggles' car had run through a stop sign. Another eyewitness, who was seated in a truck, was not produced on trial by either side, but he gave a statement to the investigator for the insurance company for defendants, and told defendants' adjuster that the Ruggles' car made a complete stop before entering the intersection. The

5

jury was not given this information; it was heard by the court during the questioning of Borge C. Pallesen in connection with the hearing on the release. It was definitely established that Selby had a clear unobstructed view of the Ruggles' car as he came toward it, and from a direction off to the right of it. The testimony indicates that Selby attempted to drive through the outer lane when less than half that lane was open, leaving no room to pass.

With the general verdict, the jury returned answers to special interrogatories finding:

(1) that Ruggles was in the exercise of ordinary care; and

(2) that the defendant Selby was guilty of wilful and wanton misconduct.

Defendants did not contend that these answers were contrary to the evidence, nor did they ask to have them set aside. From a careful review of the record, we are satisfied that the evidence submitted to the jury established the liability of defendants.

The principal question, then, turns on the finding by the chancellor that the release was void. Plaintiffs claim that the release was based on a mutual mistake of fact with respect to the nature and extent of Ruggles' injuries. Defendants, on the other hand, contend that they were released from all actions, damages or demands arisen, arising or growing out of any accidents or matters, and especially the accident complained of, and they say this release is binding upon the parties.

With reference to the injuries sustained by plaintiffs, it appears that following the accident Mrs. Ruggles did not remember anything for some time. When she became aware of her surroundings, she was still in the car and was confused and dazed. Her husband got out of the car, and she noticed that his face was bleeding. When the police arrived, she was

6

placed in an ambulance and taken to St. James Hospital in Chicago Heights, where she was examined, X-rayed, and put to bed. Dr. Fred Kampe saw her in the emergency room. As the result of a contusion she had pain and tenderness in her chest, in her right shoulder and right knee. She was taken home from the hospital later that day in her brother's car and went to bed. Mr. Ruggles was likewise taken to the hospital, where a diagnosis was made of contusion of the skull, a type of injury that is usually deep—not on the surface. His knee and elbow were also injured. X-rays were taken of the skull, elbow and knee, and showed negative as to bone fractures, but he was found to have a contusion—an accumulation of blood under the skin—of the frontal part of his head. The physicians testified that a person may suffer damage to the brain without a skull fracture.

Dr. Morris W. K. Byrne, the Ruggles' family physician, saw the plaintiffs the day after the accident. He found that Mrs. Ruggles had a badly injured right shoulder which was hurting; one of her ribs was out of place, her knees were lacerated, and an elbow was injured. She also had a hematoma of the forehead with swelling; both eyes were swollen and discolored; her right shoulder had a large hematoma, and the shoulder was strained and painful on motion; motion was limited in her arm; she had pain in her right chest and a large hematoma over the right thigh; both knees were swollen; there were numerous bruises on her legs. She was given treatment, including physiotherapy, for these conditions, for a number of weeks—for a longer period, in fact, than Mr. Ruggles was treated, because her shoulder was painful for quite a long time.

Dr. Byrne testified that prior to the accident both Mr. and Mrs. Ruggles had been his patients for many years and were in good health; that when he saw Mr. Ruggles the day after the accident he had a

7

number of injuries, pretty well limited to the right side, although he had an abrasion confined to the frontal area of the skull but more to the left side; the inside of his lower and upper lips was cut, he had a laceration of his right elbow, a blood clot on his right knee which was swollen, and a large ecchymotic area over the knee, as well as a number of small bruises on his body, and was complaining of headache. Dr. Byrne prescribed dressings, physiotherapy, and general medical and supportive treatment. Mr. Ruggles appeared to make good progress and went back to work in September, about five days following the accident. After a short period of time he appeared to have improved considerably—it was during October that Dr. Byrne discharged him as a patient— and in December, when he had a physical examination, his general condition seemed satisfactory. Mr. Ruggles had no symptoms and made no complaints which would suggest to Dr. Byrne that a subdural hematoma was then developing in the patient's brain. It was in December, when Mr. Ruggles had seemingly recovered from his injuries, that he and Mrs. Ruggles signed the release in an amount which did not equal their financial expense occasioned by their medical bills and the loss of their car.

After returning to his work, Mr. Ruggles became moody and nervous—a condition which his wife attributed to the accident and to the loss of his car; she testified that he was "lonesome" for it. He went to work once or twice a week until the following February, using the bus for transportation.

Up to the time of the accident in September of 1954, his health, eyesight and hearing had been good. He had no disability in speech, no difficulty in walking or in the use of his arms. About the end of December, 1954, and after the case had been settled, he began to stumble as he walked, and to hold his

hands to his head at times. As the weeks passed, he would press his forehead and shake his head. Later, in January and February, he developed trouble with his speech. One day in February of 1955 he reported for work appearing in good health but saying he had a headache; later that same day he became very ill—he was unable to walk or to talk normally. One of the company's drivers took him home. He could not tell his wife what was wrong and just shook his head. She undressed him and put him to bed. He tried to say something to his wife but could not talk, and was too weak to sit up in bed. Mrs. Ruggles called Dr. Byrne, who came to the house, and on examining the patient found that he had become quite sick, had difficulty with his speech, and showed marked weakness in his right arm and leg—he was dragging his right foot. He complained of headache; his speech difficulty was marked—he was slurring words and could not think of what he wanted to say. The doctor concluded that he had some type of cerebral vascular condition but could not tell precisely what it was without opening the skull. Mr. Ruggles was ordered confined to his bed, and rest and quiet were prescribed for the next three weeks. His condition steadily worsened, and on March 6, 1955, at the direction of Dr. Byrne, he was taken by ambulance to Mercy Hospital in Chicago, where Dr. Byrne was a staff member, and was admitted as a patient. The weakness in his arms and legs and right side generally had increased, the speech difficulty had worsened to the point where he had almost complete aphasia. Dr. Harold C. Voris, a neurosurgeon on the staff, was called in consultation. It was thought that Mr. Ruggles had some type of intracranial lesion or pressure. Encephalograms were taken to aid in the diagnosis; it was found that the ventricle on the left side of the brain was depressed and misplaced, indicating the location of a

9

mass. Dr. Voris determined that a brain operation was necessary and accordingly performed it on March 15, 1955; a large subdural hematoma was removed. After surgery the wound did not drain and did not heal. It thereupon became necessary to remove the piece of bone which had been lifted during the operation, and on April 5, 1955, surgery was performed for that purpose. Basically, there is now no bone covering a two and one-half to three-inch square area of the left parietal region; only dura (or membrane) and scalp cover the area. In July, 1955, when he was last seen by Dr. Voris, Mr. Ruggles was sitting in a chair, was able to take a few steps with assistance, but had marked spasticity and weakness in his right extremities, and his speech was impaired to the extent that he could not speak sentences—only occasional words or phrases. Dr. Voris expressed the opinion that this condition would be permanent. Both Dr. Byrne and Dr. Voris testified that the subdural hematoma was caused by an injury. Dr. Voris said that a subdural hematoma is almost invariably due to a brain injury, and that during surgery, without knowing of the accident, he inferred that there must be a history of injury. In answer to a hypothetical question, Dr. Voris testified that he could say, with reasonable certainty from the scientific and medical viewpoint, that the accident and injury suffered on September 16, 1954, were sufficient to cause and bring about the subdural hematoma found in the brain of the hypothetical person on March 15, 1955.

Dr. Byrne's testimony was substantially to the same effect. Dr. Byrne continued to see Mr. Ruggles from 1955 to the fall of 1958 (the time of the trial) at intervals of three to eight weeks. Many times Mr. Ruggles has complete aphasia; he becomes semiconscious for a day or two until, with medication, he again becomes aware of his surroundings. Occasional-

10

ly he has serious flare-ups in which he has twelve to fourteen convulsions, with a temperature, is incontinent—all due to the condition of the brain following the injury and surgery. At the time of the trial he could be propped up and sit in a chair; although he drags his foot, he can, with the help of Mrs. Ruggles, walk to the bathroom. He feeds himself with his left hand, but cannot cut meat or butter bread. He has been confined to his room for the last three years; he has no use of his right arm or hand; Mrs. Ruggles bathes and cleans him. He has been declared an incompetent person.

No medical testimony was offered for the defense.

In the fall of 1954, when the Ruggles were trying to decide whether or not to settle their case, Mrs. Ruggles was still complaining of her injuries. She said Pallesen, the adjuster for the insurance company, then told her he knew she was going to be all right, that Dr. Byrne had told him. Pallesen denied talking to Dr. Byrne or making that statement. He testified that before Mr. Ruggles signed the release it appeared to him (Pallesen), in the latter part of November and the early part of December, 1954, that Ruggles was not suffering in any way from the ill effects of any injury, that it looked as though he was all right, and that he had gotten over the effects of the accident. He admitted that at the time his company believed that Mrs. Ruggles was more seriously injured than her husband, and she was still complaining about her right shoulder. Pallesen believed that Ruggles' injuries were then of a relatively slight nature and said that Ruggles had told him on October 15, 1954, that he felt he had made a complete recovery from his injuries. The only information the representative of defendants' insurance company had as to the nature and extent of the Ruggles' injuries when they settled the case was what Ruggles told him by word of mouth, the reports from Dr.

11

Byrne, and what he learned at St. James Hospital, and the adjuster then believed that the injuries to the Ruggles were as shown through these sources when he was evaluating their cases for settlement.

The principal question turns on the finding by the trial court, sitting as a chancellor, that the release was void. Plaintiffs contend that it was based on a mutual mistake of fact with respect to the nature and extent of the injuries. Defendants, on the other hand, claim that the terms of the release are clear and certain, that it was executed in the absence of fraud or duress, and therefore plaintiffs released defendants from all actions or demands arisen, arising or growing out of any accidents or matters, and that it covered unknown, as well as known, injuries, and was so understood by the parties.

■ ■ The trend in most states, including Illinois, is to apply to releases a doctrine of liberality with respect to the attempts of injured parties to set aside releases or settlement agreements which subsequently prove to be grossly unfair and unjust. This point of view is well presented in the recent case of Clancy v. Pacenti, 15 Ill.App.2d 171, where, under similar circumstances, a release upon payment of $150 for personal injuries was held to be void on grounds of mutual mistake of fact, and judgment was entered in the sum of $22,500. Numerous cases are there cited and discussed in support of this point of view. The trend to set aside releases of personal-injury claims in those situations where the facts, when finally known, present an unconscionable result, is due in large measure to the fact that these are matters for the chancellor in equity who is vested with that degree of discretion and flexibility necessary to the doing of justice under the circumstances of each individual case.

■ Defendants place emphasis on the fact that the release in question contained the language "all known

and unknown, foreseen and unforeseen bodily and personal injuries." The argument seems to be that if the claimant releases his claim for unknown, as well as known, injuries, he has waived his legal right to be mistaken as to just what injuries he does or does not have. Differentiation in the treatment of releases of injury claims and other contracts is found in the effect given to the language of the instrument. The courts of Illinois—indeed, most jurisdictions in this country—have refused to permit any form of words, no matter how general or all-encompassing, to foreclose the chancellor from scrutinizing the release and the attendant circumstances to be sure that it was fairly made and accurately reflected the intention of the parties. A leading case on this subject is Great Northern Ry. Co. v. Reid, 245 Fed. 86 (9th Cir.), where a release was set aside on the ground of mistake. The court observed that the release itself was as broad as it could be made, "acquitting the company of all liability arising on account of the injuries received by appellee, whether then appearing or growing out of the same by development in the future, or arising or to arise out of any and all personal injuries sustained at any time or place while in the employ of the railway company prior to the date of the release," but the court concluded that "in such a release . . . the general language will be held not to include a particular injury, then unknown to both parties, of a character so serious as clearly to indicate that, if it had been known, the release would not have been signed." Defendants contend that the Clancy case is without authority in the instant proceeding because the release there did not include "any specific language applying to unknown or unforeseen injuries," and they rely principally on three cases in support of their contention that plaintiffs are precluded from attacking the release for mutual mistake because the release applied to unknown and unforeseen injuries. Berry v. Struble,

13

20 Cal.App.2d 299, 66 P.2d 746, offers strong support for defendants' point of view, for there the court gave full effect to a release drawn to cover all known or unknown claims growing out of a particular accident; but such a construction is unusual. In Thomas v. Hollowell, 20 Ill.App.2d 288, another principal authority for defendants, plaintiff sought to set aside the release on the ground that although he knew he had previously suffered from ulcers, he did not have reason to believe that his condition had been aggravated by trauma occasioned by a collision alleged to be caused by defendant. The court said that plaintiff was relying on a set of facts which, at best, could be only a unilateral mistake, and, considering the case on its own particular circumstances, the court held that "the mere lack of knowledge of some condition on the part of releasor, is not sufficient to avoid the bar of a release which expressly applies to unknown conditions, in the absence of mutual mistake, fraud or overreaching." In Gumberts v. Greenberg, 124 Ind. App. 138, 115 N.E.2d 504, the third case on which defendants place great reliance, plaintiff knew that she had a fractured wrist at the time the release was executed but sought to have the release set aside because she subsequently learned that the bones had not healed in proper alignment. There the court said that defendant recognized the doctrine of mutual mistake as applied to contracts—involving the right to rescind the settlement agreement—but in that particular case the court found that the mistake that led to the execution of the release was unilateral and insufficient to make the release voidable.

Also in support of their contention that the release in question is irrevocable defendants cite Yehle v. New York Cent. R. Co. (a memorandum decision), 295 N. Y. 874, 67 N.E.2d 516. (For the facts of that case it is necessary to refer to Yehle v. New York Cent.

14

R. Co., 267 App. Div. 301, 46 N.Y.S.2d 5.) The New York Court of Appeals affirmed the holding by the Appellate Division of the Supreme Court that the evidence established that release for a substantial sum signed by a passenger and her husband for injuries which were known and all other injuries which might result from train wreck was intended by the parties to cover the injuries not known at the time of execution of the release, and, hence, release could not be avoided as to unknown injuries on ground of mutual mistake. Defendants also place reliance on a Minnesota case, Hanson v. Northern States Power Co., 198 Minn. 24, 268 N. W. 642, in which the court held that "where the parties expressly and intentionally settle for unknown injuries, the release is incontestable," and under the specific facts there considered the court believed that "this is the case here, and the release involved was not made under mutual mistake." But the court stressed the individual nature of its decision by saying that "even though a release expressly includes unknown injuries, such expression is not conclusive, and mutual mistake may be shown for the purpose of vitiating the agreement." Later Minnesota cases adopted an even more liberal interpretation with respect to rescission of releases; the rationale underlying these decisions is well expressed in Larson v. Stowe, 228 Minn. 216, 36 N.W.2d 601, where the court said:

"A determination of whether a mutual mistake of fact induced the settlement is not foreclosed by the express language of any pleading. Express language alone, wherever found, is not sufficient, but must be coupled with the factual element of an existing intent to include unknown injuries. The scope of the intent of the parties is a question of fact for the trier of fact. . . . The existence of injuries of such a character that reasonable parties could not have entered into the agreement except through error is an element that

15

weighs heavily against the finality of all-inclusive language. Although the trial court's discretionary power to set aside its prior approval of a personal injury settlement is to be exercised cautiously, the strict rules governing releases from liability for other torts or breaches of contract do not apply. In the case of prolonged disability from injuries, the compelling need for immediate cash provides an economic compulsion that may lead to hasty and improvident settlements, even though fraud and undue influence be wholly absent. It is submitted that by reason of the special interest of the public in preventing injured persons from unnecessarily becoming burdens upon society in consequence of their improvident settlement of injuries, the well-developed tendency of the law—which though acknowledged in practice is usually not acknowledged in name—is to adopt a more liberal rule for the setting aside of releases in these cases than otherwise obtains."

In the recent case of Couillard v. Charles T. Miller Hospital, Inc., 253 Minn. 418, 92 N.W.2d 96, the court said that "as we view the present authorities of this state with reference to 'unknown injury' . . . situations, it appears that release is to be binding only with respect to claims for injuries actually within the contemplation of the parties to the release, and this is so regardless of the language of the release."

In Kirchgestner v. Denver & R. G. W. R. Co., 118 Utah 20, 218 P.2d 685, defendant argued that even if the parties were mutually mistaken with respect to the nature and extent of plaintiff's injuries, the mistake was immaterial because the plaintiff by the release discharged all claims and causes of action which he then had or might thereafter have or claim on account of any and all personal injuries whether then known or unknown, apparent or unapparent, including complications arising from personal injuries, and that the

16

very basis of the release was that the parties might be wholly mistaken as to the nature and extent of the injuries suffered by the plaintiff. "However logical the defendant's argument may seem," the court said, "the authorities are to the contrary. Because a release is as all-inclusive in its terms as legal ingenuity can make it and purports to release all possible claims arising out of an accident and is understood as such by the releasor, it will nevertheless be set aside when it can be shown that at the time of its execution both parties were laboring under a mutual mistake as to the extent of the injuries suffered by the releasor." To the same effect see Aronovitch v. Levy, 238 Minn. 237, 56 N.W.2d 570, Doyle v. Teasdale, 263 Wis. 328, 57 N.W.2d 381, Chicago & N. W. Ry. Co. v. Curl, 178 F.2d 497 (8th Cir.), Montgomery Ward & Co. v. Callahan, 127 F.2d 32 (10th Cir.), and Denton v. Utley, 350 Mich. 332, 86 N.W.2d 537.

In an article entitled Problems concerning Settlement Agreements, appearing in 53 Northwestern UL Rev 283 (1958), Harold Havighurst (professor of law at Northwestern University) said:

"Although a few courts [referring to courts in three states—California, for which the Berry v. Struble case was cited; Iowa; and Minnesota, where the Hanson v. Northern States Power Co. case was included in the citations] give full effect to a release which in terms covers unknown injuries, or uses other language broad enough to indicate an intent to make the settlement final irrespective of more serious developments, the usual construction is otherwise. Following the same principles which . . . have been followed in construing general releases, the language has been limited to the injuries known at the time of the settlement. [Citing in a footnote two of the decisions here discussed or referred to—Doyle v. Teasdale and Kirchgestner v. Denver & R. G. W. RR.]."

It thus appears that the courts do not necessarily give full effect to the broad all-inclusive language of releases; and in those cases where such releases have been held to bar actions for unknown injuries it has often been because the amount of the settlement indicated that part of the consideration paid was intended to cover possible unknown injuries.

In the light of the vast majority of decisions holding that releases may be set aside in equity where there appeared to be a mutual mistake regarding the nature and extent of the injuries sustained, a controlling issue in the instant proceeding becomes whether or not there was a mutual mistake with respect to the injuries suffered by plaintiffs. The chancellor's finding of mutual mistake is supported by the evidence. It is clear and undisputed that Mr. Ruggles believed he had made a complete recovery from his injuries prior to the execution of the release, and it likewise appeared to Mrs. Ruggles that her husband had recovered from the effect of his injuries. There were no symptoms and no indications from the patient's history that would lead Dr. Byrne, the attending physician, to suspect that a subdural hematoma was then developing. In fact, the doctor had discharged Mr. Ruggles two months prior to the execution of the release, and at the time of discharge he believed Mr. Ruggles had made a complete recovery. A significant factor indicating that Ruggles was mistaken as to the nature of his injuries is the amount of money accepted as consideration for the release—$900 for both claims. According to the testimony of the adjuster, the medical bills for the Ruggles amounted to approximately $500. The Ruggles' car was a total loss; the adjuster figured its pre-accident value at $200, but an automobile mechanic who had regularly serviced the car assessed its pre-accident value at $500. If the $500 car valuation is used, the Ruggles' expenses were not compen-

sated in full by the consideration. In the circumstances the amount of the consideration for this release certainly does not indicate that the Ruggles had even the slightest idea or knowledge that his injuries were other than relatively minor; nor does it indicate an understanding or intent on their part that this nominal consideration was to cover any injuries other than those they knew they had sustained at that time.

The question then arises whether defendants were likewise mistaken as to the nature and extent of the Ruggles' injuries at the time the release was executed. The insurer of necessity does not contend that it knew the nature and extent of Mr. Ruggles' injuries; to do so would be tantamount to an admission of fraud on its part. Rather, its contention seems to be that there is some area that lies between mistake as to the nature of the injuries and actual knowledge of the nature of the injuries, and that its corporate state of mind was in that in-between area at the time of the execution of the release. It was for the chancellor to determine from the evidence whether the insurer had mistaken information concerning the nature and extent of Mr. Ruggles' injuries, or whether it made this settlement independently of any such knowledge or information, mistaken or otherwise.

It is urged by defendants that they considered this a case of questionable liability during the period of negotiation but were nevertheless willing to consider some settlement. Pallesen testified that he considered this to be a case of doubtful liability, but he reached that opinion without getting statements from Mr. and Mrs. Ruggles as to what had occurred; he never interviewed Van Every, an eyewitness. He obtained no statement from the eyewitness O'Mara who testified for plaintiff. The one witness he did talk to, a Mr. Page, who had been seated in a parked truck with O'Mara, told him that Ruggles' car did stop before

19

entering the intersection. On the basis of the testimony given by O'Mara, Van Every, and Mrs. Ruggles, the jury found that the defendant Selby was guilty of wilful and wanton misconduct and, conversely, that Ruggles was in the exercise of ordinary and reasonable care. From these circumstances we conclude that there was no substance to Pallesen's conclusion—and the defendants' assumption—that this was a case of doubtful liability; Pallesen did not pursue readily ascertainable facts of the occurrence, and those which he investigated were not favorable to his company. It has been held that the source of the mistaken information is not controlling; if a mistake was in fact made, then rescission may be proper. See Fraser v. Glass, 311 Ill. App. 336, and Munnis v. Northern Hotel Co., 237 Ill. App. 50.

Upon the record we conclude that the instant case was one of liability, and that defendants at no time had sufficient information to justify any different conclusion. All the parties concerned believed that Mr. Ruggles' injuries were of a minor nature and that he had recovered from them at the time the release was executed. Certainly none of the parties contemplated that he received injuries of so serious and disabling a nature as they were later determined to be; and the amount of money paid supports the conclusion that it was not his intention to waive any rights he might have to unknown and undiscovered injuries at the time he executed the release. There was sufficient evidence produced before the chancellor to justify setting aside this release on the grounds of mutual mistake of the parties with regard to an existing material fact.

Defendants contend that the failure to tender the $900 bars recovery in this case. Early v. Martin, 331 Ill. App. 55, involved a wrongful death action wherein the public administrator executed releases for a settlement of $233 which the court subsequently set

20

aside. There the same issue as to omission of tender was raised by the appealing defendant (a codefendant had abided by the judgment of the trial court and accepted a tender of $150); the reviewing court disposed of the appealing defendant's contention by saying that most of the cases relied on by defendant involved actions of law and continued:

"It has often been held that equity is not bound by the strict rules of tender prevailing in the common law. Kuzlik v. Kwasny, 383 Ill. 354. Our Supreme Court in the case of Kennedy v. Neil, 333 Ill. 629, . . . said: 'The technical rules that govern pleas of tender in actions at law are manifestly not applicable to the circumstances of suits in chancery, and a court of chancery is not bound by any fixed rule on this subject by which it will allow the substantial ends of justice to be perverted or defeated by the omission of an unimportant or useless act which nothing but the merest technicality could require.' We are afraid that a court of equity would lose much of its prestige as a court of conscience, if it held that the plaintiff's cause of action should be destroyed because of the delay in an offer to repay the defendant its $83."

There remains the contention that the court erred in permitting the case to be tried completely at one trial instead of holding two trials—one separate trial on the release question and a second trial on liability and damages; but no cases are cited on this issue. Section 51 of the Civil Practice Act (Ill. Rev. Stat. 1959, ch. 110) provides that "actions pending in the same court may be consolidated, as an aid to convenience, whenever it can be done without prejudice to a substantial right." Such matters rest largely within the discretion of the trial judge, and the procedure finally adopted by Judge Tucker was carefully considered and was not prejudicial. The evidence with respect to the release was heard in chambers, and after the court found that the release was invalid because

21

of a mutual mistake of fact, the question of liability and damages was submitted to the jury. The award of damages was certainly not excessive. As a result of the injury Ruggles has become mentally incompetent and physically helpless. He is confined to his room most of the time, cannot walk or feed himself without assistance, nor can he bathe himself. His speech is inarticulate, his memory has failed, and for all intents and purposes his life ended as the result of the injuries sustained in this automobile accident.

For the reasons indicated, the judgments entered by the court are affirmed.

Judgments affirmed.

BRYANT, P. J., and BURKE, J., concur.