**Pearl Smith, Appellee, v. Joseph Broscheid, Appellant.**

**Gen. No. 11,852.**

Third District.

February 17, 1964.

Hupp & Irion, of Ottawa (George C. Hupp, of counsel), for appellant.

Kevin D. Kelly, of LaSalle (Sidney Z. Karasik, of Chicago, of counsel), for appellee.

ROETH, J.

Plaintiff filed suit to recover damages for injuries alleged to have been sustained in an automobile collision. Plaintiff was a passenger in an automobile being driven by her husband which was proceeding west on one of the city streets of Peru, Illinois. She had just previously been picked up by her husband at the Westclox factory, where she worked as an assembler of wrist watches, and both were homeward bound. Ahead of the car in which plaintiff was riding were several cars and a bus. The bus stopped to permit passengers to alight and the line of cars ahead of the car in which plaintiff was riding also stopped. While in a stopped position plaintiff's husband's car was struck from the rear by defendant's truck.

After the original complaint was filed and after various motions, affidavits and counteraffidavits were filed, plaintiff's counsel amended the complaint by adding Count 2. This count was an equity count by which it was sought to set aside a certain release

signed by plaintiff and her husband for an expressed consideration of $216.99. In Count 2 it is alleged that at the time plaintiff signed the release she believed that her injuries were of a very minor nature and consisted of only a muscle strain; that her doctor assured her that such was the case; and that the adjuster for defendant's insurance company likewise believed that such was the case. It is further alleged that there was a mutual mistake of the parties; that the consideration was grossly inadequate and that her injuries were in fact serious and permanent. Issues were joined as to Count 2 and they were submitted to a jury for determination. The jury found the issues for plaintiff and the court entered a decree setting aside the release. Subsequently, the issues made on Count 1 of the complaint (the personal injury count) were tried by a jury resulting in a verdict for plaintiff in the amount of $9,500. Judgment was entered on this verdict. An appeal has been prosecuted to this court as to both the decree under Count 2 and the judgment under Count 1. However, except for the question of excessiveness of the verdict, the issues raised on this appeal relate only to the trial on Count 2. The record in this case is in two parts, the one consisting of the evidence produced on the trial of the issues as to Count 2 and the other relating to the evidence produced on the subsequent trial of the issues as to Count 1. In the first instance therefore, we have confined our examination of the testimony to that produced on the hearing of Count 2, the equity count to set aside the release.

The collision in question occurred on February 25, 1960, at about 4:30 p. m. Plaintiff testified that the force of the collision threw her forward into the windshield and that she lost consciousness for a minute or two. She started to get out of the car but felt dizzy and had a numbness in her neck and left arm down

to her fingers. There is a dispute as to the force of the impact. Plaintiff and her husband testified that their car was driven forward 10 feet and defendant fixes the distance at 4 to 6 inches.

After arriving home she went to see a Dr. Timerman, who gave her a superficial examination. She remained home from work for one day and two days later she again saw the doctor, who again gave her a superficial examination. No X-rays were taken on either occasion. At the time she signed the release in question her neck and arm were sore and numb. She testified that she thought it was merely muscular strain since Dr. Timerman had told her she would be all right. Dr. Timerman died 6 months before the trial.

On March 1, 1960, a claim adjuster of defendant's insurer talked to plaintiff over the telephone. She advised him she had been examined by a doctor and that her husband's car was driveable. On March 5, 1960, the adjuster saw and talked to plaintiff's husband. At that time he prepared a release and draft for $216.99 which included $10 for two visits of plaintiff to the doctor, $16.50 for plaintiff's 1 day lost time at work and the balance for car damages. He advised plaintiff's husband that the release was a husband and wife release and that he was settling both a husband and wife claim and that it covered all damages incurred in the accident. Mr. Smith signed the release and it and the draft were taken to the office of the insurance agent carrying the insurance on the Smith car. On March 9, 1960, plaintiff signed the release and her husband picked up the draft. Plaintiff testified that at the time she signed the release she thought she was going to be all right and did not consider her injury to be serious or of a lasting nature. The adjuster testified that at the time the settlement was made he thought it was overly fair; that he was under

the impression plaintiff's injuries were not serious and (at the time he testified) was still of that opinion. Plaintiff's husband testified to a conversation with the adjuster at the time discovery depositions were taken in which the adjuster said that if he had known that plaintiff was so severely injured he would not have made the settlement that he did. The adjuster denied this conversation. It is significant to note that, except for the initial phone call, the adjuster did not at any time see or talk with the plaintiff. He did not contact her doctor or obtain any medical report from him. He did not suggest an examination by any company doctor. In substance, as the adjuster testified, he was anxious to get the release signed which he thought would cover the injury question.

The record before us discloses that following the signing of the release plaintiff continued to have periodic pain in her neck and down her arm. At the trial on Count 2 she testified that she could not hold anything heavy with her left hand; that she could turn her neck to the right but turning it to the left bothered her; that raising her left arm caused terrific pain through the middle of her neck; that she had difficulty in holding the materials for watch repair with her left hand and that while bending over her work her neck gets stiff. In November, 1960, plaintiff entered the hospital under the care of a Dr. Lucas. Her admission to the hospital was for a gall bladder condition, entirely disassociated from the automobile collision. While in the hospital she complained to Dr. Lucas of the pain in her neck and arm and Dr. Lucas took a series of X-rays of the cervical area of the spine. Those X-rays revealed a narrowing of the intervertebral space between the 5th and 6th cervical vertebrae with a degeneration of the disc. In response to a hypothetical question he testified that this condition could or might be the result of the occurrence in

question. The doctor recommended she remain in the hospital under traction but plaintiff didn't think she could afford that and therefore preferred to go home. He then recommended heat and massage at home and a home-type traction device. Plaintiff saw Dr. Lucas several times after her release from the hospital on November 17, 1960, and then not again until April, 1962. At this time it was especially for her neck and arm condition. In November of 1960 when plaintiff left the hospital Dr. Lucas recommended the home traction device. He testified that there were two recognized methods for treating the condition he found in plaintiff, one, the more conservative method of traction, heat and massage and the other, a surgical operation by a neurosurgeon to remove the disc. Plaintiff did not get such a device until April, 1962, after her last visit to Dr. Lucas when Dr. Lucas advised her that he could not do anything more for her without the use of the traction device. Thereupon plaintiff purchased the recommended device and had been using it continuously from April, 1962, up to the time of the trial. She testified the traction device helped her arm and relieved the numbness but did not help her neck.

The basic question is whether under the foregoing factual situation, the court was warranted in setting aside the release. Under what facts and circumstances a release of a personal injury claim may be avoided for mistake as to the nature and extent of the injuries, has been the subject of decision by numerous courts. The question is exhaustively covered by a recent annotation in 71 ALR2d 82. It would appear that, generally speaking, the modern trend of decisions is toward liberally relieving a party who has signed a release under a mistake as to the extent of his injuries.

122

In the case of Clancy v. Pacenti, 15 Ill App2d 171, 145 NE2d 802, decided in 1957, the court sustained the setting aside of a release under a similar factual situation as exists in the case at bar. The opinion in this case contains an exhaustive analysis of the legal questions involved. The same result was reached in Ruggles v. Selby, 25 Ill App2d 1, 165 NE2d 733, decided in 1960. Here again the opinion is exhaustive. Worthy of note is the following language of the court:

> "The trend to set aside releases of personal-injury claims in those situations where the facts, when finally known, present an unconscionable result, is due in large measure to the fact that these are matters for the chancellor in equity who is vested with that degree of discretion and flexibility necessary to the doing of justice under the circumstances of each individual case."

As opposed to these cases counsel for defendant rely upon Thomas v. Hollowell, 20 Ill App2d 288, 155 NE2d 827, and Hudson v. Theis, 35 Ill App2d 189, 182 NE2d 760. In Thomas v. Hollowell, supra, the case arose on the pleadings. There, plaintiff filed a complaint to recover damages for personal injuries. Defendant's answer set up a release. Plaintiff replied that the release was void "by reason of a mistake on his part, due to lack of knowledge of certain facts." Judgment was entered *on the pleadings* for defendant. The crux of the decision is found in the following language of the court:

> "The facts set up in the reply do not indicate any mutual mistake, nor that the release was obtained by misrepresentation, overreaching, or other fraud. Plaintiff relies entirely on a state of facts which, at best, could only be a unilateral mistake."

123

In the case at bar there is the admitted fact that the representative of defendant's insurer (the adjuster) did not regard plaintiff's injuries as serious. His own testimony is to this effect. It is further borne out by his inactivity in his investigation as hereinbefore noted. And, the fact that only $26.50 was paid to plaintiff, while perhaps not sufficient in and of itself to establish a mutual mistake, is certainly a factor to be considered in determining whether there was a mistake.

The case of Hudson v. Theis, supra, involves an entirely different question than is here involved. While the case quotes some language from Thomas v. Hollowell, supra, the case cannot be considered as being a holding contrary to the principles announced in Clancy v. Pacenti and Ruggles v. Selby, supra. We are therefore of the opinion that the trial court properly entered a decree avoiding the release after the verdict of the jury.

Error is assigned on the refusal of the trial court to strike the testimony of Dr. Lucas as to the pathology shown by the X-rays. On direct examination Dr. Lucas produced three X-rays of the cervical area of plaintiff which had been taken at his direction. He then proceeded to describe the pathology shown in the X-rays. On cross-examination it developed that he did not originally interpret the X-rays. This was done by a specialist in radiology from Chicago in his presence, which is the customary way of interpreting X-rays involving the particular injury of plaintiff, in the hospital where plaintiff was confined. The doctor then testified that after the specialist pointed out the narrowing of the space between the cervical vertebrae he himself could see the pathology and that when he testified to the interpretation of the X-rays he himself could see the difference in the disc space. Out of the

presence of the jury, counsel for defendant moved to strike the testimony of the doctor as being hearsay, which motion was denied.

The view has been taken by Professor Wigmore that the diagnosis of a physician based upon information received from another physician having personal observation and in interest in learning and describing accurately should be admitted. 3 Wigmore, Evidence p 8, Par 688.

In Alexander v. Covel Mfg. Co., 336 Mich 140, 57 NW2d 324, where the precise question was involved, the court said:

> "When testifying, Dr. Louiselle conceded that his diagnosis was based in part upon a pathological report and a conference with another doctor. Defendant claims that since he admitted he relied on what other doctors had told him, his testimony of his diagnosis was hearsay. We are unable to agree with this reasoning. His conclusions were presented as his own and were not any more hearsay by reason of being based upon consultation with other doctors than if based upon a lecture or textbook. No person is born with a knowledge of medicine and a doctor's conclusions must of necessity, in many instances, be based upon information acquired from sources outside of himself."

In State Realty Co. v. Ligon, 218 Ala 541, 119 So 672, the court held that this type of evidence presented an exception to the hearsay rule because the necessities of medical science require that it be presumed that professional reports of other doctors are made to aid in a correct diagnosis of a particular ailment. To the same effect is Sundquist v. Madison Ry., 197 Wis 83, 221 NW 392. We believe that this is the sensible view

125

and that it should apply in the case at bar. We therefore hold that no error was committed in permitting the testimony of Dr. Lucas to stand.

■ Defendant finally contends that the damages awarded are excessive. The amount of damages to be awarded in a personal injury case is, generally, the prerogative of a jury. A finding as to damages will not be set aside unless it appears to have been the result of passion and prejudice. This rule is so well established that a citation of authorities is unnecessary. We have carefully examined the testimony produced on the trial of the issues as to Count 1. In this type of injury where recurring pain is experienced from normal use of parts of the human anatomy, damages are difficult to assess. Lack of large out of pocket expenses for medical treatment or absence from work for extended periods of time do not necessarily reflect the seriousness of the injury. We do not consider the damages as excessive in this case.

Accordingly the decree and the judgment of the Circuit Court of LaSalle County will be affirmed.

Affirmed.

CULBERTSON, P. J. and SCHEINEMAN, J., concur.