No. 2--01--0591

_________________________________________________________________

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT 

_________________________________________________________________

THE PEOPLE OF THE STATE ) Appeal from the Circuit Court

OF ILLINOIS, ) of Du Page County.

)

Plaintiff-Appellee, )

)

v. ) No. 99--MR--688

)

JOHN SWANSON, ) Honorable

) Edward R. Duncan,

Defendant-Appellant.
 ) Judge, Presiding.

_________________________________________________________________

PRESIDING JUSTICE HUTCHINSON delivered the opinion of the court:

Respondent, John Swanson, appeals from the trial court's order finding him to be a sexually violent person pursuant to the provisions of the Sexually Violent Persons Commitment Act (the Act) (725 ILCS 207/1 
et seq.
 (West 1998)).  On appeal, respondent argues (1) the Act is unconstitutional under the United States Supreme Court's recent decision in 
Kansas v. Crane
, 534 U.S. 407, 151 L. Ed. 2d 856, 122 S. Ct. 867 (2002); (2) the trial court erred in denying his request to dismiss the State's petition as untimely; (3) the trial court abused its discretion in allowing certain hearsay testimony; and (4) his trial counsel was ineffective for failing to object to testimony concerning the results of his penile plethysmograph test.  We affirm.

In 1991 respondent pleaded guilty to the charge of aggravated criminal sexual assault and was sentenced to 18 years' imprisonment.  On April 7, 1999, respondent was released from prison on mandatory supervised release.  On May 10, 1999, respondent was again incarcerated after he violated the terms of his parole by leaving the state.  As a result of this violation, respondent's date of discharge from the Illinois Department of Corrections (IDOC) for his aggravated criminal sexual assault conviction was recalculated to September 10, 1999.

On August 31, 1999, 10 days before respondent's scheduled discharge, the State filed a petition to commit respondent pursuant to section 40 of the Act.  725 ILCS 207/40 (West 1998).  The petition alleged that respondent had several mental disorders, including paraphilia, polysubstance dependence, severe antisocial personality disorder, and severe narcissistic personality disorder.  The State alleged that respondent was dangerous to others because his mental disorders created a substantial probability that he would engage in future acts of sexual violence.  Accompanying the petition, the State provided a mental health evaluation of respondent prepared by psychologist Dr. Jacqueline Buck.

On December 17, 1999, respondent filed two motions to dismiss the State's petition.  The first motion was predicated upon constitutional grounds and alleged that the Act's definitions of the terms "mental disorder" and "sexually violent person" were overly broad and vague and violated his right to substantive due process.  See 725 ILCS 207/5(b), (f) (West 1998).  In the second motion, respondent argued that the State's petition was untimely because it was not filed within 30 days of April 7, 1999, which was the date that respondent was first released on parole.  See 725 ILCS 207/15(b) (West 1998).  The trial court denied both motions.

On December 6, 2000, the trial court conducted a bench trial on the State's petition.  Dr. Jacqueline Buck, a clinical psychologist employed by the IDOC, testified on behalf of the  State.  Dr. Buck testified that she performed a psychological evaluation of respondent on July 23, 1999.  Dr. Buck explained that the victim of respondent's aggravated criminal sexual assault offense was a 14-year-old girl.  Respondent, who was 26 years old at the time of the offense, threatened the victim with a knife and forced her to engage in an act of vaginal intercourse.  Dr. Buck also detailed respondent's other relevant sexual history, which included an incident where respondent, age 16, was found molesting his 6-year-old brother.  Respondent also reported that he was repeatedly molested by a male teacher during the fifth, sixth, and seventh grades.  Finally, respondent reported that he had raped at least six girls prior to his incarceration.  Respondent's criminal history included 9 felony convictions over a period of 19 years.  However, respondent's 1991 conviction of aggravated criminal sexual assault was his only conviction of a sexual offense.

Dr. Buck diagnosed respondent as having a sexual disorder known as "paraphilia, not otherwise specified, sexually attracted to nonconsenting persons."  Dr. Buck also diagnosed respondent as suffering from polysubstance dependence, severe antisocial personality disorder, and severe narcissistic personality disorder.  Dr. Buck testified that respondent refused to participate in various sexual-offender treatment programs offered to him while he was in prison.  Respondent also regularly used drugs throughout his life and while he was in prison.  Although respondent received treatment in prison for his drug abuse, respondent continued to use drugs.  Dr. Buck opined that it was substantially possible within a reasonable degree of psychological certainty that respondent would reoffend with acts of sexual violence.

On direct examination, the State asked Dr. Buck whether she had discussed respondent's case with Dr. Agnes Jonas, another psychologist who had screened respondent for possible commitment prior to his supervised release in April 1999.  Over respondent's hearsay objection, the trial court permitted Dr. Buck to testify as follows:

"I wanted to consult with [Dr. Jonas] to understand why she did not refer or recommend an interview for [respondent], and given what I was looking at in the file, to be sure that my recommendation was based [on] solid data.

And [Dr. Jonas] expressed dismay that she had overlooked those many reports and strongly recommended that he indeed be interviewed this time."

The State also called Dr. Phil Reidda, a clinical psychologist who had evaluated respondent in September and October 1999.  Dr. Reidda opined that respondent was manipulative and lacked insight into his behavior.  Dr. Reidda further opined respondent was at "a very high risk" to commit future acts of sexual violence.  On cross-examination, defense counsel questioned Dr. Reidda about respondent's religious beliefs.  Dr. Reidda testified that respondent had told him that some aspects of sexual-offender treatment were "pornographic" and "against God's word."  When Dr. Reidda requested that respondent take a penile plethysmograph test, he initially refused on religious grounds.  However, respondent subsequently agreed to take the auditory portion of the test.

On redirect examination, the State asked Dr. Reidda about the results of the plethysmograph test.  Dr. Reidda testified that respondent's level of erectile response to auditory sexual depictions of forceful sex with a grammar-school-aged girl displayed deviant sexual arousal.  On re-cross-examination, Dr. Reidda acknowledged that he did not know whether the test results included a margin of error.

Respondent called forensic psychologist Dr. Lyle Rossiter to testify on his behalf.  Dr. Rossiter testified that he evaluated respondent in July 2000.  Dr. Rossiter testified that respondent was alert and cooperative.  Dr. Rossiter acknowledged that respondent had suffered from an antisocial personality disorder in his twenties.  Dr. Rossiter opined that respondent had a "bona fide religious conversion," which he had been able to use for psycho-therapeutic purposes.  Dr. Rossiter testified that respondent had made a legitimate effort to replace "the passion of his sociopathy with the passion of his religious investment."  Dr. Rossiter opined that respondent was not feigning his religious conversion.

On cross-examination, Dr. Rossiter acknowledged that, although he agreed with Dr. Buck's diagnosis that respondent suffered from paraphilia, he disagreed with her diagnosis that respondent suffered from "severe" personality disorder.  Rather, Dr. Rossiter viewed respondent's personality disorder to have been "modified."  Dr. Rossiter agreed that, should respondent become disillusioned in his religious beliefs, a strong probability existed that respondent would reoffend.

Respondent testified on his own behalf.  Respondent testified that he had been on a "journey" to become more like Christ and that he was "zealous about it."  Respondent testified that he had become a different and better person.

At the close of the evidence, the trial court found that the State had proved the allegations of its petition beyond a reasonable doubt.  The trial court subsequently conducted a dispositional hearing and committed respondent to the custody of the Illinois Department of Human Services.  Respondent filed a timely notice of appeal.

Respondent first contends that the Act is unconstitutional because it violates his rights to substantive due process.  Relying on the recent United States Supreme Court decision in 
Kansas v. Crane
, 534 U.S. 407, 151 L. Ed. 2d 856, 122 S. Ct. 867 (2002), respondent argues that the Act violates due process because it contains no requirement that the State prove beyond a reasonable doubt that he has serious difficulty in controlling sexually violent behavior.

Statutes are presumed constitutional; this court will uphold a statute's constitutionality whenever reasonably possible, and any doubts will be resolved in favor of the law's validity.  
In re Detention of Allen
, 331 Ill. App. 3d 996, 1003 (2002), citing 
People v. Jeffries
, 164 Ill. 2d 104, 111 (1995).  The party challenging a statute bears the burden of clearly establishing its unconstitutionality.  
Allen
, 331 Ill. App. 3d at 1003, citing 
People v. DePalma
, 256 Ill. App. 3d 206, 210 (1994).  Our review is 
de novo
.  
Allen
, 331 Ill. App. 3d at 1003.

In 
Crane
, the Supreme Court held that, in order to commit a sexual offender, the State is obligated to show that the individual has serious difficulty in controlling his or her behavior.  
Crane
, 534 U.S. at ___, 151 L. Ed. 2d at 862, 122 S. Ct. at 870.  Although the 
Crane
 Court refrained from stating exactly what proof the State must present to demonstrate a lack of control, the Court noted that the State must "distinguish the dangerous sexual offender whose serious mental illness, abnormality, or disorder subjects [her or] him to civil commitment from the dangerous but typical recidivist convicted in an ordinary criminal case."  
Crane
, 534 U.S. at ___, 151 L. Ed. 2d at 863, 122 S. Ct. at 870.

Here, although the Act does not explicitly mandate a determination regarding a respondent's ability to control himself or herself, it does provide that the State must prove that the respondent suffers from a mental disorder that affects the respondent's ability to control his or her conduct.  See 725 ILCS 207/5(b) (West 1998).  Therefore, to find a respondent sexually dangerous, the trier of fact must find that the State has proved that respondent was dangerous because he or she suffered from a mental disorder that made it substantially probable that he or she would engage in further acts of sexual abuse.  See 725 ILCS 207/5(f) (West 1998).  Accordingly, there is no need for the finder of fact to make additional findings regarding a respondent's ability to control his or her conduct.  See 
In re Detention of Trevino
, 317 Ill. App. 3d 324, 335-36 (2000) (holding that Act necessarily requires a finding that respondent lacked volitional control over his or her behavior).  We therefore conclude that the Act sufficiently narrows "the class of persons eligible for confinement to those who are unable to control their dangerousness."  
Kansas v. Hendricks
, 521 U.S. 346, 358, 138 L. Ed. 2d 501, 513, 117 S. Ct. 2072, 2080 (1997).

In the present case, there was no need for the trial court to make an additional finding that respondent had serious difficulty in controlling his behavior when it had already found that respondent had a "mental disorder" that affected his emotional or volitional capacity predisposing him to engage in acts of sexual violence.  See 725 ILCS 207/5(b) (West 1998).  We therefore conclude that, in accordance with 
Crane
, the State proved beyond a reasonable doubt that respondent has serious difficulty in controlling his sexually violent behavior.  For all of these reasons
, we uphold the Act's constitutionality.

Respondent's next contention on appeal is that the trial court erred in denying his motion to dismiss the State's petition based on timeliness grounds.  Respondent argues that the Act required the State to file its petition within 90 days of his discharge or entry into mandatory supervised release or within the initial 30 days of his entry date into parole 
or mandatory supervised release.  See 725 ILCS 207/15(b) (West 1998).  Respondent argues that the State's petition was untimely because it was not filed within 90 days of his first release on April 7, 1999, or within 30 days thereafter.

At the time in question, section 15 of the Act provided, in pertinent part, as follows:

"(b) A petition filed under this Section shall allege that all of the following apply to the person alleged to be a sexually violent person:

* * *

(2) The person is within 90 days of discharge or entry into mandatory supervised release from a Department of Corrections correctional facility for a sentence that was imposed upon a conviction for a sexually violent offense or for a sentence that is being served concurrently or consecutively with a sexually violent offense or is within the initial 30 days of the person's entry date into parole or mandatory supervised release[.]"  725 ILCS 207/15(b) (West 1998).

Although the term "discharge" is not defined in the Act, Illinois courts have construed the term to mean " 'the 
final termination of a commitment
 to the [IDOC].' [Citations.]"  
In re Detention of Gardner
, 307 Ill. App. 3d 85, 90 (1999); 
People ex rel. Johnson v. Pate
, 47 Ill. 2d 172, 174 (1970).  An individual has not been "discharged" from the IDOC when the individual is released from a correctional facility on mandatory supervised release or parole.  
Gardner
, 307 Ill. App. 3d at 90.  Rather, the IDOC retains custody over the individual until the term of supervised release or parole is successfully completed.  
Gardner
, 307 Ill. App. 3d at 90.  Accordingly, for purposes of the Act, an offender is discharged from his sentence only when the IDOC no longer has actual or constructive custody over the offender.  
Gardner
, 307 Ill. App. 3d at 90.

 The procedural posture of this case is similar to that at issue in 
Gardner
.  In that case,
 the defendant was convicted in February 1995 of aggravated criminal sexual abuse.  
Gardner
, 307 Ill. App. 3d at 88.  In December 1996 the defendant was released from prison and placed on mandatory supervised release.  In April 1997 the defendant violated his supervised release when he was convicted of the offense of failing to report a change of address as a sexual offender.  The defendant was sentenced to a 26-month prison term for this conviction to be served concurrently with his original sentence for aggravated criminal sexual abuse.  As a result of his second conviction, the discharge date for the defendant's aggravated criminal sexual abuse conviction was recalculated to January 1998.  When the defendant was released from prison in January 1998, he still had to serve one year of mandatory supervised release for his second conviction.  In October 1998 the defendant again violated the terms of his mandatory supervised release, and his discharge date on his second conviction was recalculated to November 28, 1998.  
Gardner
, 307 Ill. App. 3d at 88.  The State filed its petition to commit the defendant as a sexually violent person on November 24, 1998.  
Gardner
, 307 Ill. App. 3d at 87. 

The reviewing court in 
Gardner
 held that the State's petition was filed within the proper time requirements provided for in section 15 of the Act.  
Gardner
, 307 Ill. App. 3d at 91.  The court explained that, because the defendant's sentence for his second conviction was served concurrently with his sentence for aggravated criminal sexual abuse, section 15 of the Act permitted the State to file a petition within 90 days of the defendant's discharge for the sentence on the second conviction.  Because the defendant's discharge from the IDOC for his second conviction was not until November 28, 1998, the court held that the State's petition was timely filed on November 24, 1998.  
Gardner
, 307 Ill. App. 3d at 91; see also 
Allen
, 331 Ill. App. 3d at 1002 (holding that the State may file a petition within 90 days of 
any
 discharge or entry into mandatory supervised release).

In light of this authority, we conclude that the State's petition in this case was timely filed.  Although respondent had been released from prison on mandatory supervised release on April 7, 1999, he had not been "discharged" at this time and remained in the constructive custody of the IDOC.  After respondent violated the terms of his mandatory supervised release, he was again incarcerated and his release date for his sentence for aggravated criminal sexual assault was recalculated to September 10, 1999.  Because respondent's commitment to the IDOC has not been finally terminated, the State's August 31, 1999, petition was timely filed within 90 days of respondent's date of discharge as required by section 15(b)(2) of the Act.  See 
Allen
, 331 Ill. App. 3d at 1002; 
Gardner
, 307 Ill. App. 3d at 88.  We therefore hold that the trial court properly denied respondent's motion to dismiss.

Respondent's next contention on appeal is that the trial court abused its discretion in permitting Dr. Buck to testify regarding her conversation with Dr. Jonas concerning respondent's case.  As noted earlier, Dr. Buck testified that Dr. Jonas was "dismayed" that she had overlooked certain psychological reports concerning respondent.  Respondent argues that this testimony was inadmissible hearsay because it was not a basis of Dr. Buck's opinions.

The admissibility of evidence is a matter for the trial court's discretion, and a trial court's evidentiary rulings will not be disturbed on appeal absent an abuse of discretion.  
People v. Hoffstetter
, 203 Ill. App. 3d 755, 771 (1990).  A trial court abuses its discretion only in those instances where its decision is arbitrary, fanciful, or unreasonable or where no reasonable person would take the view adopted by the trial court.  
People v. Illgen
, 145 Ill. 2d 353, 364 (1991).

The state of the law governing this issue is well settled.  An expert may rely on reports made by others to formulate an opinion as long as other experts in the field reasonably rely on such materials.  
People v. Anderson
, 113 Ill. 2d 1, 7 (1986).  Although reports made by others are not substantively admissible, an expert is nonetheless allowed to reveal the contents of the materials upon which the expert has reasonably relied to explain the basis of his or her opinion.  
Anderson
, 113 Ill. 2d at 9.

In this case, Dr. Jonas's hearsay statement would be admissible only if it was a basis of Dr. Buck's opinions regarding respondent's psychological condition.  Although Dr. Buck testified that she relied upon Dr. Jonas's statement in formulating her opinions about respondent, a review of the statement at issue demonstrates that the statement had nothing to do with respondent's psychological condition.  Dr. Jonas's comment that she was "dismayed" that she had overlooked certain psychological reports lacked relevance to the case, as it did not provide any information as to respondent's psychological condition.  Rather, the comment simply indicated that Dr. Jonas was disappointed with her own job performance.  As such, the comment could not form a basis of Dr. Buck's opinions concerning respondent.

In support of the trial court's ruling, the State cites 
Smith v. Broscheid
, 46 Ill. App. 2d 117 (1964).  In that case, the reviewing court held that an expert could testify that his opinion regarding the pathology shown from certain X rays was based upon his consultation with a specialist who had originally interpreted the X rays.  
Smith
, 46 Ill. App. 2d at 125-26.  This case is unlike the situation in 
Smith
 because Dr. Buck did not rely on a specific finding or report made by Dr. Jonas.  Instead, Dr. Buck testified that she relied upon Dr. Jonas's statement that she was "dismayed" that she had failed to observe certain reports in respondent's file.  Because Dr. Jonas's statement was not probative to respondent's actual psychological condition, we conclude that, standing alone, it could not be a basis of Dr. Buck's opinions.  Therefore, we conclude that the trial court abused its discretion in allowing the statement into evidence.

However, not every erroneous admission of evidence requires reversal.  
People v. Rozo
, 303 Ill. App. 3d 787, 790 (1999).  A new trial is warranted only where the evidence improperly admitted was so inflammatory that it deprived the defendant of a fair trial or where the improper evidence appears to have affected the outcome of the trial.  
Rozo
, 303 Ill. App. 3d at 790.  In this case, the introduction of Dr. Jonas's hearsay statement does not warrant a new trial.  As detailed above, the evidence overwhelmingly showed that respondent was a sexually violent person.  Indeed, we note that respondent does not challenge the sufficiency of the State's evidence on appeal.  All of the testifying experts agreed that respondent suffered from the mental disorder of paraphilia, and Drs. Buck and Reidda opined that there was a substantial possibility that respondent would reoffend in a sexually violent manner.  Their opinions were predicated upon respondent's history of sexual offenses and mental illness, his substance abuse, and his continuing refusal to participate in sexual-offender treatment.  Accordingly, we conclude that the admission of the hearsay statement did not affect the outcome of the trial and was harmless.

Respondent's final contention on appeal is that he was deprived of his right to the effective assistance of counsel when his attorney failed to object to the introduction of the results from his penile plethysmograph test.  Respondent argues that plethysmograph evidence is unreliable and has not been accepted by the mental health community.  Respondent concludes that the evidence was highly prejudicial and affected the outcome of his trial.

The right to the effective assistance of counsel is guaranteed by both the United States and Illinois Constitutions.  U.S. Const., amend. VI; Ill. Const. 1970, art. I, §8.  To prevail on a claim of the ineffective assistance of counsel, a defendant must establish that (1) counsel's representation fell below an objective standard of reasonableness, and (2) counsel's errors were so serious as to deprive the defendant of a fair trial.  
Strickland v. Washington
, 466 U.S. 668, 687, 80 L. Ed. 2d 674, 693, 104 S. Ct. 2052, 2064 (1984).  To establish prejudice, the defendant must show that, but for counsel's errors, there is a reasonable probability that the result of the proceeding would have been different.  
Strickland
, 466 U.S. at 694, 80 L. Ed. 2d at 698, 104 S. Ct. at 2068.  In this context, reasonable probability means a probability sufficient to undermine confidence in the outcome.  
Strickland
, 466 U.S. at 694, 80 L. Ed. 2d at 698, 104 S. Ct. at 2068.

Dr. Reidda testified that a penile plethysmograph test is performed by placing a circular gauge over the base of the subject's penis.  
Once the gauge is attached to the penis, the subject is given various audio and video sexual stimuli involving children and adults of both sexes.  If the subject becomes aroused by the stimuli, the gauge expands when the penis becomes engorged with blood, and the growth of the penis is measured by a recording device attached to the gauge.  
The subject's responses to these various stimuli are measured and scored.  As noted above, Dr. Reidda 
testified that the level of respondent's erectile responses to auditory sexual depictions of forceful sex with a grammar-school-aged girl displayed deviant sexual arousal.
 

Our research has uncovered no Illinois case addressing the reliability or admissibility of penile plethysmograph tests.  Courts in other jurisdictions that have considered this question have come to varying conclusions.  Some courts have concluded that plethysmograph tests  are reliable and have been accepted by the scientific community.  See 
Berthiaume v. Caron
, 142 F.3d 12, 17 (1st Cir. 1998); 
Walrath v. United States
, 830 F. Supp. 444, 447 (N.D. Ill. 1993); 
Washington v. Riles
, 135 Wash. 2d 326, 343-44, 957 P.2d 655, 663-64 (1998).  Other courts have held that plethysmograph testing is unreliable and should not be considered.  
In re Mark C.
, 7  Cal. App. 4th 433, 444-45, 8 Cal. Rptr. 2d 856, 863 (1992); 
Gentry v. State
, 213 Ga. App. 24, 25-26, 443 S.E.2d 667, 669 (1994); 
State v. Spencer
, 119 N.C. App. 662, 667-68, 459 S.E.2d 812, 815-16 (1995); 
In re A.V.
, 849 S.W.2d 393, 399 (Tex. Ct. App. 1993).

In light of the fact that the scientific validity of plethysmograph tests has not been considered in Illinois, we believe that defense counsel should have objected to the admissibility of the test results and requested the trial court to conduct a hearing pursuant to 
Frye v. United States
, 293 F. 1013 (D.C. Cir. 1923).  Based upon our review of the authorities cited above, it appears that there is significant controversy regarding the reliability of penile plethysmograph tests and whether they have been accepted by the scientific community.  Absent such a showing, we are not convinced that penile plethysmograph tests have probative value and question whether the results should be considered by the trier of fact.  The introduction of the results of such tests will undoubtedly have a significant prejudicial impact against the subject, and justice demands that the State make a threshold showing that such tests are reliable and have gained general acceptance in the expert's scientific field.

However, even if respondent's trial counsel was deficient for failing to object to the testimony concerning the results of the plethysmograph, we nonetheless conclude that respondent cannot establish that the result of the proceeding would have been different if defense counsel had objected to the evidence.  As already noted, even without the testimony, the other evidence overwhelmingly showed that respondent was a sexually violent person.  In making its findings, the trial court relied upon this other evidence and did not indicate that it had placed any weight upon the plethysmograph test results.  Additionally, the prejudicial impact of the evidence was reduced because the case was tried before the bench as opposed to a jury.  See 
People v. Brink
, 294 Ill. App. 3d 295, 302 (1998).  For all of these reasons, we conclude that respondent cannot establish the second prong of 
Strickland
 and hold that respondent is not entitled to a new trial. 

For the foregoing reasons, we affirm the judgment of the circuit court of Du Page County.

Affirmed.

BOWMAN and KAPALA, JJ., concur.