No. 2--00--0999 

______________________________________________________________________________

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

______________________________________________________________________________

In
 
re
 DETENTION OF JACKIE HUGHES ) Appeal from the Circuit Court

) of Lake County.

)

) No. 99--MR--1054

)         

(The People of the State of ) Honorable

Illinois, Petitioner-Appellee, v. ) Raymond J. McKoski,

Jackie Hughes, Respondent-Appellant). ) Judge, Presiding.

______________________________________________________________________________

JUSTICE KAPALA delivered the opinion of the court:

Respondent, Jackie Hughes, appeals from a jury trial in the circuit court of Lake County in which he was found to be a sexually dangerous person under the Sexually Dangerous Persons Act (the Act) (725 ILCS 205/0.01 through 12 (West 1998)) and was committed to the Illinois Department of Corrections.  For the following reasons, we affirm the jury verdict and order of commitment.

FACTS

On August 11, 1999, respondent was indicted on various charges pertaining to sex offenses involving minors.  Respondent was taken into custody on these charges on July 22, 1999, and was denied bond on July 27, 1999.  The trial court set the trial date for September 13, 1999.

On September 10, 1999, the trial court granted respondent's oral motion for a continuance and set the trial for October 13, 1999.  On October 13, 1999, respondent moved to continue the trial because he needed to review DNA test results and possibly consult with an expert.  The trial was continued until November 29, 1999.

On November 4, 1999, respondent filed a motion to suppress, which was heard on November 10 and 17, 1999.  Also, on November 17, a hearing was conducted pursuant to section 115--10 of the Code of Criminal Procedure of 1963 (the Code) (725 ILCS 5/115--10 (West 1998)).  The section 115--10 hearing was continued to November 24, 1999.

On November 24, 1999, the State moved to continue the trial, asserting it needed more time to prepare the minor victims for trial because it had recently learned that one had a learning disability and the other was having difficulty speaking due to fear.  Over respondent's objection, the trial court granted the State's motion and set the trial for January 10, 2000.

On December 30, 1999, the State filed its petition to declare respondent a sexually dangerous person.  On that same date, respondent objected to the filing of the "sexually dangerous person" petition, objected to any further delay, and filed a demand for a speedy trial.  The trial court set the matter for status on January 24, 2000, and for trial on February 14, 2000.  Also, on December 30, 1999, the trial court suppressed certain statements respondent made to the police because the State failed to prove they were voluntary and failed to prove that respondent waived his right to counsel.

On January 5, 2000, the trial court denied respondent's motion to preclude disclosure to court-appointed psychiatrists of the previously suppressed statements he made to the police.  On January 6, the trial court ordered respondent transported for a penile plethysmograph (plethysmograph) test and ordered respondent to cooperate with all psychiatrists and their testing.  The trial court also ordered respondent to be transported on January 13, 2000, to Dr. Oris Wasyliw for psychological evaluation.

On February 14, 2000, the trial court granted the State's motion to reschedule the hearing to March 31, 2000.  Respondent's counsel answered ready for the February 14 trial.

On March 21, an attorney from the public defender's office moved for a continuance because respondent's former counsel had left the public defender's office.  The trial court continued the trial to June 5, 2000.  On June 2, respondent requested another continuance, and the trial was set for August 14, 2000.  The jury trial commenced on August 14, 2000.

During jury selection, the State exercised a peremptory challenge against juror 135.  Respondent objected because juror 135 was the only black person in the venire.  The trial court commented that
 the challenged venire person was "the only African-American in the whole courtroom" and found that, balanced "with the other factors," respondent had established a 
prima
 
facie
 case of discrimination.  The trial court then asked the State to offer a race-neutral reason for challenging juror 135.

The State contended it was challenging juror 135 because she had given birth to a child at the age of 17 and her son had also had a child at 17 years old.  The State further argued that juror 135 did not know the names of the companies employing her children or where their spouses worked.  The State also pointed to the fact that the juror had two children who did not work.

The State further offered that, "based on her response[,] she doesn't understand things, she is having difficulty listening.  It would seem difficult to me that she doesn't know where her husband worked.  Took her awhile to remember."  The State contended that, based on juror 135's response, it did not believe "she is perhaps understanding."

The trial court ruled that the State had not offered a race-neutral reason for challenging juror 135.  The State asked for time to submit case law on the issue of race-neutral reasons for excusing jurors.  The trial court allowed the State to do so and allowed the parties to "backstrike" a juror if appropriate.

During his portion of the 
voir
 
dire
, respondent asked juror 135 if she could be fair and impartial regarding testimony from a psychologist or psychiatrist.  She responded, "I guess so according to what it is all about, you know.  I suppose yes, because I wouldn't know nothing about the person was under the strain."  

After lunch, the State submitted several cases to the trial court.  The State further argued that, as to the question of impartiality regarding psychological or psychiatric testimony, juror 135 "seemed not to understand really the issue or the questions.  She did not provide a clear and unequivocal answer to that one way or the other, and seemed that she may have trouble following that proposition of law."  The trial court put off its ruling until all the jurors had been selected.

The next morning, the trial court allowed both sides to further argue about the race-neutral issue as to juror 135.  The State noted that, when asked if any member of her family had ever been arrested or convicted, juror 135 said no.  The State had checked the evening before (August 14, 2000) and discovered her son was currently on probation for domestic battery and had prior felony convictions.  Thus, the State contended that juror 135 was "mistaken or gave the Court misinformation."  The State then stated that "this is yet another reason that we would add to the reasons we stated yesterday which certainly is a race neutral reason, certainly a valid reason for dismissing any juror that, in fact, there is a pending case not against her but against one of her children."

After listening to the court reporter read back respondent's counsel's 
voir
 
dire
 and juror 135's responses, the trial court reversed its ruling, finding the State presented race-neutral reasons for excusing juror 135.  The trial court explained that it considered juror 135's answer about impartiality to be equivocal, because she answered "I guess so," and that the State could consider that answer to be a race-neutral reason to challenge juror 135 because the State was "relying on a big chunk of [its] case being a psychiatrist."  The trial court also considered the fact that juror 135 incorrectly answered no to the question of whether any family member had ever been arrested or convicted to be a race-neutral reason.  The court further explained that, while the State raised the issue of conviction late, it could not "hold that against the State," because it allowed the parties further argument and had delayed its ruling accordingly.  The trial court agreed with respondent that having a child at age 17 and having two unemployed children are not race-neutral reasons.  The trial court also did not consider the juror's delay in remembering where her husband worked to be a race-neutral justification.  Nor did the trial court agree that juror 135 had difficulty listening.  The trial court then struck juror 135.

In addition to the other evidence at trial, the State offered the expert testimony of several witnesses.  Oris Wasyliw, the director of adult clinical psychology at the Isaac Ray Center in Chicago, testified that he evaluated respondent.  As part of that evaluation, he conducted a clinical interview of respondent as well as several objective tests.  Wasyliw also reviewed prior evaluations, prior treatment records, police reports, and court documents.

According to Wasyliw, in the interview respondent said that he was attracted to young girls because of how they conducted themselves, including how they talked about what they saw their mothers do with their mothers' boyfriends.  To Wasyliw, this meant that respondent was not talking about an individual but about an idea he had of how children conducted themselves as a group.

As for objective tests, Wasyliw administered a Minnesota Multiphasic Personality Inventory (MMPI).  The MMPI determines whether a subject is being honest and whether he is exaggerating or minimizing a problem.  It further assesses the presence, type, and severity of any emotional difficulties.  The MMPI showed that respondent was minimizing or denying his problems.  The test also indicated a very high score on the scale of anti-social personality and hostility.

Wasyliw also conducted a Millon Clinical Multiaxial Inventory (MCMI).  Though similar to the MMPI, the MCMI is designed to conform more closely to the manual of mental health disorders that psychologists and psychiatrists use for classifying disorders.

The MCMI results were consistent with the MMPI in showing that respondent was trying to minimize or deny problems or areas of difficulty in his life.  According to Wasyliw, that is a complicated way of saying that respondent is "hiding something."

Wasyliw also conducted a Rorschach inkblot test.  The test showed that respondent is under a substantial amount of tension and somewhat emotionally fragile, suggesting that under increased stress he could have emotional problems.  Second, it showed that respondent has very poor judgment in understanding other people.  Third, the results indicated that respondent has a substantially narcissistic personality, which means he has an inflated view of himself and blames others when something goes wrong.  According to Wasyliw, this indicates respondent does not accept responsibility for his actions.

Based upon his entire evaluation, Wasyliw opined that respondent suffered from a paraphilia disorder, which is a sexual arousal occasioned by something that society considers inappropriate and which can cause harm to either the individual or another person.  Specifically, respondent suffers from pedophilia in that he is sexually attracted to female children and children outside his own family.  Wasyliw further opined that respondent continues to be at risk for inappropriate sexual behavior because of his lack of insight into his problem, his minimizing or hiding of his problem, and his lack of motivation to change.  Further, Wasyliw found this significant in light of respondent having been involved in treatment for over three years.

The State also offered the testimony of Rodgers Wilson, a forensic psychiatrist, also employed at the Isaac Ray Center.  Wilson reviewed records, police reports, and test results for respondent.  He also conducted a clinical interview of respondent.

Based on his review of medical records, his clinical interview, police reports, an Able screening test, which assesses sexual interest, and  plethysmograph test results, Wilson concluded that respondent is a sexually dangerous person.  Specifically, he opined that respondent is a pedophile and that he presents an ongoing risk to society.  Wilson defined "pedophile" as a person "who has demonstrated dangerous sexual behaviors that pose a risk to society."  The three factors that are considered in that diagnosis are the level of psychological disease, the person's insight into the disease and how it impacts others, and the person's ability to have remorse and refrain from certain behavior.  According to Wilson, past behavior is considered an indicator of future conduct. 

Wilson, who did not administer the test himself, described a  plethysmograph as a test used to measure sexual interest.  A gauge is placed around the subject's penis and he is exposed to a variety of visual and audio stimuli.  The visual stimuli consist of pictures of males, females, adults, and children.  The examiner looks for changes in circumference of the penis when the subject is shown or played the stimuli.  In defendant's case, the test showed he had a sexual interest in prepubescent females, as well as adolescent males and females and adult males and females.  The threshold for sexual arousal is a 10% increase in the circumference of the penis.  Respondent exhibited a 35% increase as to prepubescent females and a 20% increase regarding adolescent females.  Wilson defined prepubescent as before the age of 12.  Respondent's reaction to prepubescent females was the strongest he displayed on the test.

Respondent was also administered a sexual interest questionnaire.  According to Wilson, some of respondent's answers indicate he justifies his deviance by blaming the victims.  Part of the questionnaire focuses on child molestation.  Respondent answered that he had manipulated a child to get sexual pleasure and that he had molested more than one child.

In regard to his 1996 conviction, respondent admitted to abusing the child but explained that he became sexually aroused after the child touched him.  Wilson explained this was significant to his diagnosis of respondent as a pedophile because of respondent's inclination to distort and rationalize his behavior.

Wilson also reviewed police reports that contained statements respondent made to the police about prepubescent girls.  Wilson found some of those statements to be consistent with his assessment of respondent's rationalization.  For example, Wilson stated it is clinically significant that respondent told the police it is easier for him to achieve a full erection when he is sexually engaged with a child as opposed to an adult woman.  This was particularly relevant to Wilson's assessment of respondent as a sexually dangerous person because it shows a "poor prognosis" for treating defendant.  Wilson also reviewed the reports from respondent's counselor, Evaristo Ruiz, in which respondent admitted molesting a child in 1985 and, again, in 1991.  

Wilson explained that there are various levels of dangerousness or severity of pedophilia.  If a person is justifying or rationalizing his behavior, that shows a "very poor treatment prognosis."  Also, narcissism, from which respondent suffers, indicates poor treatment prognosis because the person has no sense of any consequences.  Finally, respondent's lack of empathy makes it difficult for him to succeed in counseling.

Wilson defined pedophilia based on the Diagnostic and Statistical Manual, or DSM-IV.  The manual, published by the American Psychiatric Association, is based on clinical research and is nationally recognized as a text of mental  disorders.  Respondent meets the criteria for pedophilia under the DSM-IV.  Wilson also considered respondent's prognosis to be "extremely poor" and stated that "he is at high risk to reoffend."  He described respondent as displaying "severe" symptoms of pedophilia.  Wilson pointed out examples of respondent's symptoms, including respondent engaging in vaginal penetration of children, experiencing arousal related to coercion, and his responses during the  plethysmograph testing. 

Norman Miller, a licensed psychiatrist, also testified for the State.  Miller conducted a clinical interview of respondent for the purpose of determining if he was sexually dangerous and had a propensity to commit sexual offenses against children.  Miller also had a clinical psychologist perform objective tests on respondent, including an MMPI.  Based on the interview, the MMPI, and a review of respondent's records, Miller opined that respondent is a sexually dangerous person who has suffered from pedophilia since at least 1983 or 1984.  Miller also opined that, because respondent continues to spend time around children, his "risk for reoffending is very high."  According to Miller, respondent's prognosis is poor based on his long history of pedophilia, his poor response to treatment, and his current level of denial.  Also, due to his anti-social behavior, respondent has a personality that makes it difficult for him to accept responsibility and change.  Miller admitted on cross-examination that not every pedophile or person with an anti-social personality would be sexually dangerous.

Also testifying for the State was Evaristo Ruiz, who was employed by Adelante, P.C., a practice that specializes in evaluating and treating sex offenders.  In February or March of 1996, Ruiz performed a sex offender evaluation on respondent to determine whether he was qualified for an outpatient sex offender treatment program.

During the course of Ruiz's evaluation, respondent admitted to molesting two young girls.  He also told Ruiz he was "out of control, that he couldn't control these fantasies."  On cross-examination, Ruiz admitted that, as part of his evaluation of respondent's treatment, Ruiz had reported that as of July 1999 respondent was making "good progress" and had developed a "good level of victim empathy."

During closing argument, the State discussed the plethysmograph as follows:

"[Pedophilia] is also told by tests that check your physiological responses to certain stimuli the way doctors talked and that is the plethysmograph thing you heard about.  Spend 30 seconds thinking about a plethysmograph.  This is a test that determines or measures sexual arousal, basically involuntary reaction. Picture it. You are going in some sterile, the most unerotic setting you can ever imagine with several people all around you.

* * *

There are people in the room in his case at least Dr. Wasyliw with all his machinery in what can never be described in a sensual kind of way and they show dirty pictures of little kids and they do it with this wire wrapped around the man's penis.  A man who in Mr. Grant's word has a cloud of a sexually dangerous person hanging over his head.  A man who has to be thinking in his head I am going to try to be as unaroused as possible.

I don't know if a person would be thinking about Mickey Mantle's baseball scores or whatever but anything but arousal.  And in that context they show him pictures of prepubescent girls and while trying to put himself into a mental cold shower he still has a 35 percent increase."

During rebuttal, the State further argued:

"He is sitting in a room as sterile as this with a band around his penis and he is having reactions to dirty pictures of little girls.  But what does the respondent say?  No. No. That never happened.

So the doctor lied.  Why?  I have no idea, but Dr. Wasyliw[,] court-appointed man who is an expert in the field who has years of education[,] made this up.  The reality of the situation is that is what happened.  The respondent can deny it all he wants, just like he denies anything else.  You want to talk about distortion, that is distortion because he knows what that is going to produce.  We got a problem here."

The court instructed the jury that a person is sexually dangerous if that person: "suffers from a mental disorder for not less than one year immediately prior to the filing of a petition to declare him sexually dangerous and he demonstrates propensities toward acts of sexual assault or acts of sexual molestation of children and he continues to have criminal propensities to commit sex offenses."

The jury found respondent to be a sexually dangerous person, and judgment was entered on the verdict.  Respondent filed a posttrial motion in which he objected to the striking of juror 135.  He did not raise any error as to the reference to the plethysmograph, the constitutionality of the Act, or the denial of a speedy trial.  The posttrial motion was denied, and respondent filed this timely appeal.

DISCUSSION

We first address the issue of whether respondent was denied a speedy trial.  In this regard, he contends that the Illinois speedy trial statute, section 103--5 of the Code (725 ILCS 5/103--5 (West 1998)) (Speedy Trial Act), applies to a proceeding under the Act and that, because he was in custody, the State had to begin the trial within 120 days from the time he was taken into custody.  Alternatively, he argues that he was denied his constitutional speedy trial right.

We note initially that respondent concedes that he waived the speedy trial issues by not moving to dismiss or raising the issues in his posttrial motion.  As for the issue of whether he was denied a statutory right to a speedy trial, respondent seeks to sidestep waiver by contending that his trial counsel was ineffective for failing to raise the issue in the trial court.

To prevail on a claim of ineffective assistance of counsel, a defendant must show both that (1) counsel's performance was deficient, and (2) the deficient performance prejudiced the defendant such that he was deprived of a fair trial.  
People v. Nunez
, 325 Ill. App. 3d 35, 42 (2001), citing 
Strickland v. Washington
, 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052 (1984).  The failure to satisfy either prong of the 
Strickland
 test precludes a finding of ineffective assistance of counsel.  
Nunez
, 325 Ill. App. 3d at 42.  With regard to respondent's claims under the Speedy Trial Act, we conclude that respondent's counsel's performance did not result in prejudice to respondent for the reason that the Speedy Trial Act is not applicable to a proceeding under the Act. 

By its own language, the Speedy Trial Act is limited to criminal prosecutions.  It provides, in relevant part, that "[e]very person in custody in this State for an alleged 
offense
 shall be tried by the court."  (Emphasis added.)  725 ILCS 5/103--5 (West 1998).  This language speaks of a trial for a charged offense, as opposed to any other type of proceeding, such as one under the Act.  The Code defines an offense as "a violation of any penal statute of this State."  725 ILCS 5/102--15 (West 1998).  While a respondent under the Act must be accorded the essential protections available at a criminal trial, the proceedings are civil in nature and the Civil Practice Law (735 ILCS 5/2--101 
et
 
seq
. (West 1998)) applies.  725 ILCS 205/3.01 (West 1998); 
People v. Trainor
, 196 Ill. 2d 318, 328 (2001).  As such, we consider the Speedy Trial Act, by its own terms, not to apply to the Act.  
Cf
. 
People v. Glenn
, 142 Ill. App. 3d 1108, 1109-10 (1986) (no right to speedy trial in forfeiture action under section 36--1 of the Criminal Code of 1961 (Ill. Rev. Stat. 1983, ch. 38, par. 36--1) because it is not a criminal action).

Respondent cites 
People v. Beshears
, 65 Ill. App. 2d 446 (1965), and 
People v. McVeay
, 302 Ill. App. 3d 960 (1999), as support for his contention that the Speedy Trial Act applies to the Act.  Respondent's reliance on those cases, however, is misplaced.

The court in 
Beshears
 did not hold that the Speedy Trial Act applies to the Act.  While the court discussed the language of section 103--5, it did so in the context of deciding whether the exception for competency hearings set forth in section 103--5 applied in that case.  See 
Beshears
, 65 Ill. App. 2d at 458.  The court otherwise never mentioned section 103--5 or its 120-day requirement.  Rather, the court in 
Beshears
 held that the respondent had a due process right to a speedy trial.  In that regard, the court stated that "it is quite clear how the requirements of 
due process
 were violated."  (Emphasis added.)  
Beshears
, 65 Ill. App. 2d at 459.  The court further noted that Illinois courts "have frequently admonished that 
due process of law
 must be followed in proceedings conducted under the [Act]."  (Emphasis added.)  
Beshears
, 65 Ill. App. 2d at 459.  The court concluded, therefore, that because the respondent had been in custody for about nine months "it cannot be said that 
due process of law
 has been met."

(Emphasis added.)  
Beshears
, 65 Ill. App. 2d at 459.  There is no explicit language in 
Beshears
 that the Speedy Trial Act applies.  At best, the reliance on section 103--5 is equivocal as the holding is based on due process rather than the Speedy Trial Act itself.

We further note that our supreme court has stated that "the right to due process" entitles a respondent in a proceeding under the Act to "the right to a speedy trial."
  
People v. Trainor
, 196 Ill. 2d 318, 328-29 (2001), citing  
United States ex rel. Stachulak v. Coughlin
, 520 F.2d 931, 935 (7th Cir. 1975).  A reading of the 
Coughlin
 case indicates that the court of appeals ruled that "principles of due process in general must govern proceedings brought under the Sexually Dangerous Persons Act."  
Coughlin
, 520 F.2d at 935.  In stating that the Illinois courts have accorded some of the safeguards applicable in criminal proceedings to individuals charged under the Act, the court of appeals distinguished statutorily recognized rights to a hearing, jury trial, and counsel from other rights such as the right to confront witnesses, the right against self-incrimination, and the right to a speedy trial.  
Coughlin
, 520 F.2d at 935.  As to the right to confront witnesses, 
Coughlin
 cites 
People v. Nastasio
, 19 Ill. 2d 524 (1960), wherein the Illinois Supreme Court banned the use of depositions in proceedings under the Act.  The supreme court stated, "difficult 
constitutional
 issues would be raised by the use of depositions in proceedings which so closely resemble criminal prosecutions."  (Emphasis added.)  
Nastasio
, 19 Ill. 2d at 529.  As authority for applying the due process right to a speedy trial to Act proceedings, 
Coughlin
 cites 
Beshears
. 
 
Coughlin
, 520 F.2d at 935.  Thus, we read the 
Coughlin
 decision, which is cited with approval by our supreme court in 
Trainor
, as interpreting 
Beshears
 to rely on due process rather than the Speedy Trial Act in recognizing a respondent's right to a speedy trial.

Respondent also relies on the 
McVeay
 decision.  
McVeay
, however, does not expressly address the issue of whether the Speedy Trial Act applies to the Act.  Rather, in discussing the issue of whether the Act gives a respondent the right to retain, or have appointed, his own psychiatric expert, this court noted that certain procedural safeguards have been afforded to respondents involved in a proceeding under the Act.  
McVeay
, 302 Ill. App. 3d at 964.  In doing so, this court stated, by way of example, that where a respondent is held for more than four months on a criminal charge and cannot be prosecuted, then the charge cannot serve as the basis for proceeding under the Act.  
McVeay
, 302 Ill. App. 3d at 964, citing 
People v. Beshears
, 65 Ill. App. 2d 446 (1965).  We do not read 
McVeay
 as clear authority for the proposition that the Speedy Trial Act applies to the Act, nor is it a ringing endorsement of the 
Beshears
 case in that regard.

Based on the foregoing, we hold that the Speedy Trial Act does not apply to a proceeding under the Act.  Thus, respondent was not prejudiced by his trial counsel's failure to raise the statutory speedy trial issue
 and was not, therefore, denied the effective assistance of counsel in that regard.
  

As for respondent's contention based on a due process right to a speedy trial, we also conclude that his counsel's failure to raise that issue in the trial court did not result in prejudice to respondent.  As noted in 
Trainor
, a respondent has a due process right to a speedy trial in a proceeding under the Act.  We emphasize, however, that the due process right to a speedy trial in this context does not implicate the specific speedy trial provisions of the Illinois or United States Constitution.  By their express terms, those provisions apply only to criminal prosecutions.  See U.S. Const., amend. VI ("[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy *** trial"); Ill. Const. 1970, art. I, §8 ("[i]n criminal prosecutions, the accused shall have the right to *** have a speedy public trial").  While the due process right to a speedy trial is not the same as the right to a speedy trial under the above provisions of the state or federal constitution, we consider the analysis accorded to the sixth amendment right to a speedy trial to provide meaningful guidance as to whether a respondent in a "sexually dangerous person" proceeding has been denied his procedural due process right to a speedy trial.

The sixth amendment right to a speedy trial is fundamental and is made applicable to state proceedings via the due process clause of the fourteenth amendment.  
People v. Crane
, 195 Ill. 2d 42, 46 (2001).  The nature of the speedy trial right, however, is generically different from other constitutional rights.  
Crane
, 195 Ill. 2d at 46, citing 
Barker v. Wingo
, 407 U.S. 514, 33 L. Ed. 2d 101, 92 S. Ct. 2182 (1972).  It differs from the other rights because its deprivation sometimes works to the advantage of the defendant and against the State; for example, delay is often used as a defense tactic.  
Crane
, 195 Ill. 2d at 47.  Thus, deprivation of the right to a speedy trial does not 
per
 
se
 prejudice the defendant's ability to defend himself.  
Crane
, 195 Ill. 2d at 47.  Further, because the constitutional speedy trial right is more vague, which makes it impossible to determine with precision when the right has been denied, a functional analysis of the right is necessary within the context of a particular case.  
Crane
, 195 Ill. 2d at 47.  Finally, because the remedy for a speedy trial violation requires that a defendant go free, the right to a speedy trial should always be in balance and consistent with the public's right to justice.  
Crane
, 195 Ill. 2d at 47.

To address these concerns, the United States Supreme Court identified four factors that must be balanced in determining whether a defendant's right to a speedy trial has been violated.  
Crane
, 195 Ill. 2d at 48, citing 
Barker
, 407 U.S. at 530, 33 L. Ed. 2d at 116-17, 92 S. Ct. at 2192.  
The four factors are: length of the delay, reasons for the delay, prejudice, if any, to the defendant, and the defendant's assertion of the right.  
Crane
, 195 Ill. 2d at 48.

While these factors were developed in the context of the sixth amendment right to a speedy trial, we consider them relevant in deciding whether a respondent in a "sexually dangerous person" proceeding has been denied his due process right to a speedy trial.  In fact, 
Beshears
 applied two of the four factors, length of the delay and reason for the delay.  Therefore, we will consider the 
Barker
 factors here in deciding whether respondent was denied his due process right to a speedy trial.

Applying these factors to the case at hand, we hold respondent was not denied his constitutional right to a speedy trial.  First, respondent was in custody just over a year prior to his hearing commencing under the Act.  While, standing alone, such a delay might be troubling, here there were understandable reasons for the delay, which bring us to the second factor.

Respondent shares responsibility for some of the delay.  He agreed to continue his criminal trial from September 13, 1999, to October 13, 1999, and he moved to continue his criminal trial from October 13, 1999, to November 29, 1999. On November 4, 1999, he filed a motion to suppress statements.  Additionally, respondent requested to continue the March 21, 2000, and June 5, 2000, trial dates in the Act proceeding.  

Further, the State needed time to prepare the child victims for trial and also needed time to have respondent evaluated by the psychiatric experts.  There is no evidence of any inordinate delay in that process.  In fact, we note that respondent himself injected some delay by not initially cooperating with one of the psychiatrists.  

Additionally, while respondent makes much of the fact that the State did not begin proceedings under the Act until after he succeeded on his motion to suppress certain statements he made to the police, that delay is understandable, as the State's view of its case would certainly have been affected by the suppression of those statements.  It was respondent who sought such suppression, and, while he was certainly entitled to do so, he protracted the proceedings by filing the motion several months after his arrest and prompting the State's reassessment of its case once the motion was decided in his favor.  The reasons cited for prolonging the time in this case mitigate against a finding of a speedy trial violation.

As for prejudice to respondent, other than the time he spent in custody, he points to no other prejudice in terms of his defense of his case.  We also do not identify any such prejudice in the record.  Thus, this factor weighs in favor of ruling that no speedy trial violation occurred.

Lastly, respondent never asserted his speedy trial right in the trial court.  He never moved to dismiss either the criminal charges or the Act petition on speedy trial grounds.  He did file a demand for a speedy trial under the Speedy Trial Act on December 30, 1999, but it was directed at the criminal charges only.  Respondent never demanded a speedy trial on the Act petition.  We consider respondent's assertion of his right to be minimal in this case.

When we weigh the four factors collectively, we hold that respondent was not denied his constitutional due process right to a speedy trial in the Act proceeding.  Thus, respondent was not prejudiced by his trial counsel's failure to raise the constitutional speedy trial issue and, therefore, was not denied the effective assistance of counsel in that regard.

We next address the issue of whether it was error to allow one of the State's experts to rely on and testify about a plethysmograph examination given to respondent as part of his evaluation under the Act.  We begin by noting that the State contends that respondent waived this issue because he never objected at trial or in his posttrial motion to the expert's reference to, and reliance upon, the plethysmograph test results, nor did he seek a hearing pursuant to 
Frye v. United States
, 293 F. 1013 (D.C. Cir. 1923).
  Respondent concedes waiver, but, in an effort to avoid the waiver, he contends that the error was plain.  Further, respondent maintains that he should not be barred from raising the plethysmograph issue because any waiver was attributable to the ineffectiveness of his trial counsel.

We will first address the issue of whether plain error occurred in this case.  Plain error is a limited and narrow exception to the general waiver rule, to be invoked only where the evidence is closely balanced or the alleged error is so substantial that it deprived the defendant of a fair trial.  
People v. Kuntu
, 196 Ill. 2d 105, 128 (2001).  In deciding whether there was plain error in this case, we will first determine if there was error of any sort in admitting the expert testimony based on the plethysmograph.

The exclusive test for the admission of expert testimony based on scientific methods is governed by 
Frye v. United States
, 293 F. 1013 (D.C. Cir. 1923).  
Donaldson v. Central Illinois Public Service Co.
, 199 Ill. 2d 63, 76-77 (2002).  Under the 
Frye
 test, scientifically based opinions are admissible at trial only if the methodology or scientific principle upon which the opinions are based is sufficiently established to have gained general acceptance in the particular field in which it belongs.  
Donaldson
, 199 Ill. 2d at 77.  If the underlying method used to generate an expert's opinion is reasonably relied upon by experts in the field, the fact finder may consider the opinion.  
Donaldson
, 199 Ill. 2d at 77.

The 
Frye
 test need be applied only if the scientific principle, technique, or test offered by the expert to support his conclusion is new or novel.  
Donaldson
, 199 Ill. 2d at 78-79.  Once a principle, technique, or test has gained general acceptance in the particular scientific community, its general acceptance is presumed in subsequent litigation.  
Donaldson
, 199 Ill. 2d at 78.

In this case, Wilson testified that the plethysmograph consisted of a gauge placed around the penis of the subject that measures changes in the circumference of the penis when the subject is exposed to video or audio stimuli.  The theory is that the penis will increase in circumference when the subject is sexually aroused by certain stimuli.

Wilson testified that he relied, in part, on the plethysmograph test results, which showed respondent to have a 35% increase when shown pictures of prepubescent girls and a 20% increase when shown pictures of adolescent girls, in arriving at his ultimate opinion that respondent was a pedophile and sexually dangerous.  According to Wilson, a 10% increase in penile circumference is the threshold for indicating sexual arousal.

There was no determination under 
Frye
 in this case regarding the general acceptance of using a plethysmograph to measure sexual arousal and as the basis for an opinion as to whether a subject is suffering from a sexual disorder or is sexually dangerous.  Nor has our research uncovered a case in Illinois where the 
Frye
 test has been applied to such a methodology. 

There is a dearth of Illinois cases that mention plethysmography.  In 
People v. Cole
, the court stated in 
dicta
 that a qualified psychiatrist could diagnose a mental disorder for purposes of the Act based on, among other things, "a physical test like penile plethysmography."  
People v. Cole
, 299 Ill. App. 3d 229, 234 (1998).  The respondent in 
Cole
 was not subjected to the test, there was no mention of 
Frye
, and the court did not address the admissibility of an opinion based on the technique.  
Cole
 does not support the admissibility of Wilson's opinion in this case.

In 
People v. Johnson
, 322 Ill. App. 3d 117 (2001), one of the experts who examined the respondent as part of a proceeding under the Act relied, in part, on the results of a plethysmograph.  This court, however, had no occasion to consider the admissibility of the expert's opinion on appeal and offered no opinion as to the general acceptance of the technique.  Further, there is no mention of 
Frye
 in the decision.  The 
Johnson
 case sheds no light on the issue of the admissibility of an expert opinion based on a plethysmograph.

In 
People v. Swanson
, 335 Ill. App. 3d 117 (2002), this court held that the respondent's counsel in a proceeding under the Sexually Violent Persons Commitment Act (725 ILCS 207/1 
et seq.
 (West 1998)) was deficient for failing to object to the admission of testimony concerning the results of a plethysmograph.  Our holding was based on the absence of any consideration in Illinois of the scientific validity of such a test.  
Swanson
, 335 Ill. App. 3d at 127.

Because there was no 
Frye
 determination in this case, and no such prior determination in any reported case in Illinois, it was error to allow Wilson to base his opinion on the results of the plethysmograph.

Having said that, the error here did not rise to the level of plain error.  First, the evidence was not closely balanced.  Wilson relied on respondent's records, a clinical interview, and other psychological tests.  The reliance on the plethysmograph was a relatively minor component of Wilson's testimony.  Further, there were two other expert opinions, which were not based in any part on the plethysmograph, that were entirely consistent with Wilson's opinion.  Thus, there was a significant amount of evidence independent of the plethysmograph supporting the jury's verdict that respondent is a sexually dangerous person.  Therefore, any error in Wilson relying in part on the  plethysmograph was not plain error because the evidence was not closely balanced. 

Nor was the error so substantial as to have denied respondent a fair trial.  The results of the plethysmograph were only one of several diagnostic pieces of information that provided the basis for Wilson's opinion.  Additionally, while the prosecutor mentioned the results in closing argument, we do not consider these brief comments to have placed an undue emphasis on the results.  This is especially true in light of all the other evidence in the case.

Alternatively, respondent attempts to avoid waiver by arguing he was denied the effective assistance of counsel because his attorney failed to object at trial or in his posttrial motion to Wilson's opinion based on the plethysmograph.  This argument also fails.  Again, to prevail on a claim of ineffective assistance of counsel, a defendant must show both that (1) counsel's performance was deficient, and (2) the deficient performance prejudiced the defendant such that he was deprived of a fair trial.  
People v. Nunez
, 325 Ill. App. 3d 35, 42 (2001), citing 
Strickland v. Washington
, 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052 (1984).  The failure to satisfy either prong of the 
Strickland
 test precludes a finding of ineffective assistance of counsel.  
Nunez
, 325 Ill. App. 3d at 42.

Here, any error in failing to object was not prejudicial under 
Strickland
 in that it did not affect the outcome of the case.  As noted above, the reliance on the plethysmograph results was a minimal part of the State's case against respondent.  Also, there was extensive evidence independent of the plethysmograph to support the finding that respondent was a sexually dangerous person.  Accordingly, respondent was not denied a fair trial when his counsel failed to object to admission of Wilson's opinion based on the plethysmograph results. 

We next address respondent's contention that the State exercised a peremptory challenge to exclude the only black member of the venire in violation of 
Batson v. Kentucky
, 476 U.S. 79, 90 L. Ed. 2d 69, 106 S. Ct. 1712 (1986).  The rule announced in 
Batson
 applies with equal force to civil cases.  
McDonnell v. McPartlin
, 192 Ill. 2d 505, 526 (2000), citing 
Edmunson v. Leesville Concrete Co.
, 500 U.S. 614, 114 L. Ed. 2d 660, 111 S. Ct. 2077 (1991).  Thus, we consider 
Batson
 to apply to a proceeding under the Act.

Batson
 established a three-step process for evaluating a claim that a party's peremptory challenges have been exercised in a discriminatory manner.  
McDonnell
, 192 Ill. 2d at 526.  First, the party making the 
Batson
 claim must establish a 
prima
 
facie
 case of purposeful discrimination.  
McDonnell
, 192 Ill. 2d at 526.  If a 
prima
 
facie
 case is made, the burden shifts to the other party to articulate a race-neutral reason for challenging the venire person.  
McDonnell
, 192 Ill. 2d at 526.  The trial court must then determine whether the party making the 
Batson
 claim has met the burden of establishing purposeful discrimination.  
McDonnell
, 192 Ill. 2d at 526.

Explanations advanced by the party against whom a 
Batson
 claim is made must be clear and reasonably specific, but need not rise to the level of a challenge for cause.  
McDonnell
, 192 Ill. 2d at 526.  Unless a discriminatory intent is inherent in a party's explanation, the reason offered will be considered race neutral.  
McDonnell
, 192 Ill. 2d at 526. 

When a trial court rules on the ultimate question of purposeful discrimination, the preliminary issue of whether a 
prima
 
facie
 showing has been made becomes moot.  
McDonnell
, 192 Ill. 2d at 527.  In such case, the reviewing court needs to consider only whether the trial court's ruling as to the validity of the proffered reasons for challenging particular jurors was in error.  
McDonnell
, 192 Ill. 2d at 527.  Because a trial court's finding on the ultimate issue of discrimination rests largely on credibility determinations, it is entitled to great deference on review and will not be disturbed unless clearly erroneous.  
McDonnell
, 192 Ill. 2d at 527.

In the present case, respondent contends that the trial court erred when it initially ruled that the State did not offer a race-neutral reason for peremptorily challenging juror 135 but then allowed the State to offer additional reasons and reversed its original ruling.  Respondent's contention mischaracterizes what occurred in this case.

After the court initially refused to excuse juror 135, but prior to the jury being empaneled, respondent asked her questions.  It was at that time that it became apparent that juror 135 might not be fair and impartial as to psychological or psychiatric testimony, which was a key component of the State's case.  The State, following a lunch recess, promptly raised this concern as a race-neutral reason for peremptorily challenging juror 135.  Essentially, respondent's additional 
voir
 
dire
 questions gave rise to a new peremptory challenge of juror 135 based on newly generated information.  Under these circumstances, the trial court properly found that the State had identified a race-neutral reason and accordingly allowed its peremptory challenge.

Respondent's reliance on 
People v. Roberts
, 299 Ill. App. 3d 926 (1998), is misplaced.  In 
Roberts
, the State peremptorily challenged a juror and offered as a race-neutral reason that the juror had not been truthful when answering questions on a jury card.  It did so, however, only after the trial court rejected its initial race-neutral reasons.  
Roberts
, 299 Ill. App. 3d at 930.  When the trial court rejected its race-neutral reasons, the State "suddenly asked to see the juror's card" and then contended its race-neutral reason was untruthfulness by the juror.  
Roberts
, 299 Ill. App. 3d at 930.  The court in 
Roberts
 rejected the State's contention of a race-neutral reason because the "chronology of events reveals the State was unaware of the juror's alleged 'untruthfulness' when it made its peremptory challenge."  
Roberts
, 299 Ill. App. 3d at 930.

In 
Roberts
, the State was attempting to revive a failed peremptory challenge by offering an alternative race-neutral reason that, although different from the previously tendered reasons, was based upon information that was readily available at the time the initial reasons were proposed.  The 
Roberts
 court viewed the State's actions as a subterfuge to mask purposeful discrimination.  It is evident from reading 
Roberts
 that the court considered the "chronology of events" to suggest that the State was not acting in a race-neutral fashion when it excused the juror.  It was not the timing 
per
 
se
 that caused the court to reject the State's race-neutral reason, but the implication of racial discrimination that it reflected.

In this case, no such implication exists.  Here, the State's asserted reason based on juror 135's answer about her impartiality regarding psychological or psychiatric testimony was precipitated by respondent's questioning of the venire person.  Thus, the State could not have presented that race-neutral reason any earlier than it did.  Additionally, in 
Roberts
, the court also relied on the fact that the State's asserted race-neutral reason (that the juror was being untruthful) was not supported by the record and that the State's proffered explanations were factually at odds.  
Roberts
, 299 Ill. App. 3d at 930-31.  No such circumstances exist here.  Accordingly, we find 
Roberts
 distinguishable from this case.

The last issue raised by respondent is whether the Act is constitutional.  In that regard, he contends the Act violates due process because it "contains no provision which could be seen to require the State to prove that a respondent has 'serious difficulty in controlling behavior' " as required by the United States Supreme Court in 
Kansas v. Hendricks
, 521 U.S. 346, 138 L. Ed. 2d 501, 117 S. Ct. 2072 (1997), and 
Kansas v. Crane
, 534 U.S. 407, 151 L. Ed. 2d 856, 122 S. Ct. 867 (2002).  Thus, respondent asserts that the Act is constitutionally defective because it allows the commitment of a person without a finding that the person has serious difficulty in controlling the urge to be sexually violent.

Respondent did not challenge the constitutionality of the Act in the trial court, but may do so here for the first time.  See 
People v. Wooters
, 188 Ill. 2d 500, 510 (1999).  All statutes are presumed to be constitutional.  
In re R.C.
, 195 Ill. 2d 291, 296 (2001).  The party challenging the constitutionality of a statute bears the burden of rebutting the presumption and clearly establishing a constitutional violation.  
In re R.C.
, 195 Ill. 2d at 296.  It is our duty to construe acts of the legislature so as to affirm their constitutionality and validity if we can reasonably do so.  
In re R.C.
, 195 Ill. 2d at 296-97.

Our court has recently held the Act to be constitutional in the face of a challenge under 
Hendricks
 and 
Crane
.  See 
People v. Kastman
, 335 Ill. App. 3d 87 (2002); see also 
People v. Hancock
, 329 Ill. App. 3d 367 (2002) (upholding the constitutionality of the Act against a challenge under 
Hendricks
 and 
Crane
).  This court follows its prior decision in 
Kastman
 and holds the Act is constitutional for the reasons set forth therein.

CONCLUSION

For the foregoing reasons, we affirm the circuit court of Lake County.

BOWMAN and GROMETER, JJ., concur.